**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA, *Plaintiff-Appellee*, | No. 07-10457 |
| v. | D.C. No. CR-05-00240-GEB |
| HAMID HAYAT, *Defendant-Appellant*. | OPINION |

Appeal from the United States District Court
for the Eastern District of California
Garland E. Burrell, District Judge, Presiding

Argued and Submitted
June 10, 2009—San Francisco, California

Filed March 13, 2013

Before: Mary M. Schroeder, A. Wallace Tashima,
and Marsha S. Berzon, Circuit Judges.

Opinion by Judge Berzon;
Dissent by Judge Tashima

**SUMMARY**[*]

**Criminal Law**

The panel affirmed convictions for providing material support to terrorists, in violation of 18 U.S.C. § 2339A, by attending a terrorist training camp in Pakistan and returning to this country to await orders to carry out a terrorist attack, and of making false statements to government officials, in violation of 18 U.S.C. § 1001.

The panel held that the district court did not clearly err in determining that the jury's foreperson was not motivated by an impermissible racial, ethnic, or religious bias.

The panel held that any error in preventing a witness from answering on cross-examination questions about whether the defendant ever told the witness that the defendant attended a camp run by a non-Jihadist religious organization could not have been prejudicial, as the information was already in the record.

Construing Fed. R. Crim. P. 51 and 52(b) and Fed. R. Evid. 103, the panel explained that when a party gives an invalid reason for admitting a statement at trial, the district court is not required to come up on its own with alternative grounds on which the statement could be admitted, unless failing to do so would constitute plain error. The panel therefore reviewed for plain error whether the district court's exclusion of the defendant's out-of-court statement that he

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

never intended to go to a camp was error for reasons raised for the first time on appeal. The panel held that the district court did not plainly err by failing to admit the excluded statement as a declaration of current state of mind under Fed. R. Evid. 803(3), or under the rule of completeness, Fed. R. Evid. 106.

The panel held that the district court did not err in precluding discovery of information about the witness, a confidential informant, under the Classified Information Procedures Act, or in limiting the defendant's cross-examination of the witness concerning the information.

The panel held that the district court did not err in admitting under Fed. R. Evid. 702 an Islamic studies expert's testimony about the meaning and implications of an Arabic note found in the defendant's wallet upon his return from Pakistan. The panel held that given precedents limiting Fed. R. Evid. 704(b) essentially to a semantic preclusion, any error under Rule 704(b) in the admission of the same testimony was not plain, where the expert testified about the kind of person who would carry such a note but never commented directly on the defendant's mental state.

The panel held that the district court did not abuse its discretion in excluding, for lack of qualification, a defense expert's testimony as to whether the particular note found in the defendant's wallet was a *ta'wiz*, which the expert defined as an Arabic verse or prayer used by Pakistanis as a talisman, for luck or protection, when traveling.

The panel held that the district court did not abuse its discretion in excluding – as of "marginal probative value," confusing, and cumulative – the testimony of a defense expert

former FBI agent that, among other things, interviewing agents used leading questions during interviews of the defendant.

The panel dismissed for lack of jurisdiction the defendant's appeal from the district court's order dismissing without prejudice the defendant's motion to vacate his convictions under 28 U.S.C. § 2255.

Dissenting, Judge Tashima would reverse the conviction and remand for a new trial because the judicial branch's constitutional duty to do justice in criminal prosecutions was not fulfilled in this case in which the government asked a jury to deprive a man of his liberty largely based on dire, but vague, predictions that the defendant *might* commit unspecified crimes in the future.

## COUNSEL

Dennis P. Riordan and Donald M. Horgan, San Francisco, California, for Defendant-Appellant.

S. Robert Tice-Raskin and Laura L. Ferris, Assistant U.S. Attorneys, Sacramento, California; and Sharon Lever, Deputy Chief, Counterterrorism Section, U.S. Department of Justice, Washington, D.C., for Plaintiff-Appellee.

## OPINION

BERZON, Circuit Judge:

Hamid Hayat, born in California in September 1983 and raised largely in Pakistan, was convicted of providing material support to terrorists, in violation of 18 U.S.C. § 2339A, and of making false statements to government officials, in violation of 18 U.S.C. § 1001. The terrorism statute criminalizes providing "material support or resources" to terrorists. The prosecution's case was that Hayat violated the statute by providing his services to terrorists when he attended a terrorist training camp in Pakistan and returned to this country to await orders to carry out a terrorist attack. The jury found him guilty of that conduct. No party has questioned the applicability of the statute to such conduct.

Hayat appeals on three bases: First, he maintains that he was denied a fair trial because the jury's foreperson was biased against him. Second, he asserts that the district court imposed an unconstitutional limitation on his cross-examination of the government's key witness. Third, he contends that the district court erred in admitting expert testimony offered by the government and excluding expert testimony offered by the defense. Additionally, Hayat asks us to review the district court's dismissal without prejudice of his motion to vacate his convictions under 28 U.S.C. § 2255.

We affirm the judgment of the district court. We dismiss for lack of jurisdiction the appeal of the dismissal of the § 2255 motion. The district court correctly dismissed the motion without prejudice to the filing of a § 2255 petition when this appeal is final.

## I.

Hamid Hayat is a U.S. citizen of Pakistani descent. He lived in the United States until he was seven and then, between the ages of seven and eighteen, with his grandparents in Pakistan. Hayat returned to the United States in 2000 to live with his parents in Lodi, California. Three years later, in April 2003, he traveled to Pakistan with his family. He spent just over two years in Pakistan on this second stay, returning to the United States in late May 2005. Days after his return, Hayat was arrested by FBI agents and charged with providing material support to terrorists and making false statements to government officials. The events giving rise to Hayat's arrest are as follows:

In October 2001, FBI agents in Oregon interviewed Naseem Khan, a 28-year-old Pakistani immigrant, in connection with a money laundering investigation. Khan informed the agents that he had regularly observed Ayman al Zawahiri, Osama bin Laden's second-in-command and one of the FBI's 22 most-wanted terrorists, at a mosque in Lodi, California, in 1999. Khan later told the agents that he had also seen two other individuals on the FBI's 22 most-wanted list in Lodi during the same period.[1]

The FBI then hired Khan as a confidential informant and asked him to return to Lodi to gather additional information on a suspected terrorist cell. Khan agreed. He began his work

---

[1] At Hayat's trial, government witnesses conceded that it was highly unlikely that the individuals identified by Khan had been in Lodi in the late 1990s.

as an informant in Lodi in December 2001.[2] Approximately eight months later, in August 2002, Khan met Hayat, who was nineteen years old at the time and living in his parents' garage. As explained in greater detail below, recorded conversations between Khan and Hayat indicated that Hayat's father was linked to a terrorist organization in Pakistan and that Hayat's uncle and grandfather were recruiters for "jihad."[3]

Between August 2002 and October 2003 Khan and Hayat spoke regularly. Khan recorded seven of these conversations, took notes on others, and reported to the FBI soon after every conversation with Hayat, summarizing for the agents those conversations that were not recorded. The recorded conversations were introduced at trial, as was testimony by Khan regarding unrecorded conversations. Because Khan and Hayat frequently spoke to each other in Pashto and Urdu, the jurors were provided with English translations of the pertinent parts of the recorded conversations.

In the recorded conversations, Hayat made several anti-American and anti-Semitic remarks. At one point, for

---

[2] The FBI paid Khan between $3,000 and $4,500 per month plus expenses.

[3] Hayat's father, Umer Hayat, was indicted on two counts of making false statements to the FBI—namely denying that he had firsthand knowledge of terrorist training camps in Pakistan and denying that he knew that Hamid had attended a camp—in violation of 18 U.S.C. § 1001. After a jury failed to reach a verdict on those counts, Umer Hayat pled guilty to making a single false statement to the FBI and U.S. Customs and Border Protection—falsely denying that he was carrying more than $10,000 while on a flight from the United States to Pakistan. Umer Hayat was sentenced to time served, approximately 11 months.

example, he expressed pleasure over the murder of *Wall Street Journal* reporter Daniel Pearl because his death meant that "[n]ow they can't send one Jewish person to Pakistan." In addition, Hayat at times spoke approvingly of Islamic fundamentalist groups such as Jaish-e-Mohammed and indicated his respect for their leaders. He also professed to know and to admire Pakistanis who had engaged in "jihad." Some of these people Hayat knew because they had studied in a madrassah, or religious school, in Pakistan run by his grandfather, which Hayat had also attended. Hayat told Khan that his grandfather was a prominent cleric and that after 9/11, Pakistani President Musharraf had sent him and others to Afghanistan to persuade the Taliban to hand over Osama bin Laden. Hayat also described to Khan a terrorist training camp in Pakistan — he said he had seen a video of it — and, on a few occasions, expressed interest in attending such a camp.

Five of the recorded conversations took place while Hayat and Khan were both in Lodi. At one point, when the two were discussing travel to Pakistan and a possible meeting with Hayat's uncle, Hayat said "I have one objective now. If I went to Pakistan, now, see, straight away, I'll stay at home for one or two weeks, then I'm going for training, friend." (Underlined portion spoken in English).

Hayat traveled with his family to Pakistan in April 2003. Two of the recorded conversations took place when he was there. Like the earlier conversations, they covered a wide range of topics. On one occasion, Khan scolded Hayat for being lazy and not going to a training camp. In response, Hayat protested that the camp was closed during hot weather and that had the camp been open, he "would have been there." On another occasion, Khan relayed to Hayat a

conversation in which Hayat's father explained that "[Hayat wi]ll enter the Madrassah, and, God Willing, he [will] go for training!" Hayat responded to Khan: "Um-hmm. . . . <u>No problem</u>, absolutely."    (Underlined portion spoken in English).

In another of the recorded conversations, Hayat explained to Khan how to send money to Sipah-e-Sahaba ("SSP"), a Pakistani organization that Pakistan declared a terrorist organization in 2002.  During a conversation with Khan, Hayat expressed admiration for members of SSP who die as "martyrs."  Hayat boasted that he gave more money to SSP than any other member of his Pakistani madrassah, and stated that he gave money to SSP because his money was more likely to be used to acquire "<u>weapons, books and everything</u>" than if he gave to other groups, which wasted money. (Underlined portion spoken in English).  Hayat also reported that when someone told him that he could go to jail for giving SSP money, he replied, "<u>Fuck you.  Who cares, man, who goes to jail, man?</u> . . . . <u>Fuck, look what's America doing</u> . . . ." (Underlined portion spoken in English).

Hayat made several statements to Khan indicating Hayat's knowledge of his family's involvement in terrorist activities.  For example, Hayat explained that his father in Lodi had sent money to SSP.  Hayat also told Khan that his grandfather, who was the leader of the madrassah Hayat attended in Pakistan, had called a special meeting in 1999 where he recommended that his students leave the madrassah to go participate in jihad.  In addition, Hayat explained that if someone were interested in attending a training camp, that person could contact Hayat's maternal uncle, who would either accompany that person "to the Jehad people's office,"

or make a phone call to that office on the interested person's behalf.

Hayat's direct interactions with American law enforcement began when he attempted to reenter the United States in May 2005. On May 30, 2005, Hayat's return flight to San Francisco was diverted to Japan because Hayat's name appeared on the federal government's "No Fly" list.[4] Hayat was interviewed in Japan by FBI agent Lawrence Futa. Futa questioned Hayat about his two-year stay in Pakistan, including whether Hayat had joined a terrorist organization or attended a terrorist training camp. Hayat denied joining a terrorist group or attending a training camp while in Pakistan. Futa concluded that Hayat "posed [no] immediate threat" and could be permitted to return to the United States. Hayat left Japan and flew to San Francisco that same evening.

Four days later, on June 3, 2005, FBI agents Tenoch Aguilar and Sean Wells interviewed Hayat at his parents' home in Lodi. After again explaining the reason for his family's trip to Pakistan—because of his mother's health—and his activities while in Pakistan, Hayat again denied having attended a terrorist training camp and stated that "he would never be involved with anything related to terrorism, and didn't know why anybody would say otherwise." After eliciting this response, Aguilar and Wells asked Hayat to come to the FBI office in Sacramento for further questioning.

Hayat arrived at the FBI office in Sacramento around 11 a.m. the following morning and was interviewed in four

---

[4] Hayat's name appeared on the "No Fly" list as a result of the information provided by Khan.

waves. Hayat at first denied having attended a terrorist training camp, but during the second session admitted that he had attended a camp for a few days during an earlier stay in Pakistan in 2000, where he "observed and heard weapons training," and also in 2003, when he himself received "pistol training" at a camp in "Balakot."

The third and fourth sessions, which were videotaped, took place during the afternoon and evening of June 4, 2005, and the early morning hours of June 5. During the third interview, Hayat confirmed that he had attended a camp to train for jihad and said he was trained to use a pistol and rifle and taught how to kill American troops.

Before the final session, Hayat was given *Miranda* warnings (for the second time that day) and signed an Advice of Rights form (also for the second time). Hayat reported that at the training camp, he was told to expect to receive orders in the United States. When someone wanted to transmit orders to him, the person would first contact Adil Khan (a prominent Islamic figure in the Lodi, California area); Khan would contact Shabbir Ahmed (the Imam at Hayat's Lodi mosque); and Shabbir would contact Hayat. Also, by the end of the interview Hayat had suggested that his grandfather was involved in jihadist activities, indicating that his grandfather may have held a leadership position in the terrorist camp Hayat attended.

The FBI arrested Hayat at the end of this set of interviews.

On January 26, 2006, the government filed a second superseding indictment against Hayat, charging him with one count of violating 18 U.S.C. § 2339A (providing material

support to terrorists) and three counts of violating 18 U.S.C. § 1001 (making false statements to the FBI).  Section 2339A reads, in relevant part,

> Whoever provides material support or resources or conceals or disguises the nature, location, source, or ownership of material support or resources, knowing or intending that they are to be used in preparation for, or in carrying out, a violation of [various provisions prescribing penalties for terrorist acts] . . . shall be . . . imprisoned not more than 15 years . . . .

18 U.S.C. § 2339A(a).  The statute defines "material support or resources" as "any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel (1 or more individuals who may be or include oneself), and transportation, except medicine or religious materials."  *Id.* § 2339A(b)(1).  The prosecution's case was that Hayat had provided his personal services to a terrorist organization by attending the training camps in Pakistan and returning with the intent to carry out acts of terrorism when directed to do so.  The three counts of making false statements to the FBI were related to Hayat's initial statements to various FBI agents in California, in which he denied attending a terrorist training camp while in Pakistan.

Hayat's trial began on February 14, 2006.  In addition to the seven recorded conversations between Hayat and Khan,

the government presented Khan's testimony about those conversations and Hayat's confessions to the FBI. The jury viewed the videotaped confessions, and several agents, including Futa, Aguilar, and Sweeney, testified about their interviews with Hayat. The government also introduced a "scrapbook" that agents had seized from Hayat's parents' garage, where Hayat was living. The scrapbook bore Hayat's name on the cover and contained clippings from Pakistani newspapers. Several of the articles in the scrapbook discussed Islamic fundamentalist groups, including the Taliban, and their leaders, including Osama bin Laden. Khan testified that Hayat had shown him the scrapbook while expressing support for the fundamentalist groups described in the articles.

The government's evidence also included a note written in Arabic that government agents had found in Hayat's wallet after his return from Pakistan. Khaleel Mohammed, an expert in Islamic studies who testified as an expert witness for the government, testified that the note was an Islamic supplication. He provided the following translation of the Arabic phrase: "Oh Allah we place you at their throats and we seek refuge in you from their evils." Mohammed opined that the supplication was both uncommon and "not peaceful," and that the type of person who would carry such a supplication was "[a] person who perceives him or herself as being engaged in war for God against an enemy."

Finally, the government presented testimony from two additional experts, Hassan Abbas and Eric Benn. Abbas, an expert on extremist groups, testified to the location and nature of typical terrorist training camps in Pakistan. Benn, a satellite imagery expert who had analyzed satellite images to determine the likelihood that there was a militant training

camp near Balakot between 2003 and 2005, characterized the likelihood as "a good strong possible." He further testified that when an analysis of the satellite imagery was combined with the description Hayat had provided in his confession about his travel to the camp, his assessment of the likelihood that a military training camp existed outside Balakot increased to "probable."

Hayat did not testify. He presented an expert, Anita Weiss, who testified that it is common for Pakistanis to carry a talismanic prayer, known as a *ta'wiz*, for protection while traveling. The district court did not permit Ms. Weiss to express her opinion on whether the note found in Hayat's wallet was a *ta'wiz* because Weiss does not speak or read Arabic.

Hayat also presented testimony from eleven other witnesses—mostly FBI agents—and from Naseem Khan, who had also testified for the prosecution. One aspect of Hayat's defense was that Khan was an unreliable informant who had given the FBI implausible information—namely a report that three Al Qaeda members on the FBI's most wanted list had visited a mosque in Lodi—the accuracy of which the FBI was unable to confirm, and which was belied by testimony from a regular attendee of the Lodi mosque who never saw the men. Hayat's counsel also elicited testimony from Gary Schaaf, one of the agents who interviewed Hayat, that Schaaf and other agents used leading questions and that Hayat seemed tired during the interview. In addition, agent Terry Rankhorn testified that he had posed undercover as a convert to Islam and met with Hayat four times in 2002; Hayat never mentioned training camps to Rankhorn.

Jury deliberations began on April 12, 2005. On April 25, 2005, after nine days of deliberation, the jury returned a verdict of guilty on all four counts charged in the indictment. Hayat filed a motion for a new trial based on juror misconduct and, later, a second motion for a new trial that specified thirteen additional grounds for granting a new trial.

After conducting an evidentiary hearing related to the juror misconduct charge, the district court denied Hayat's motions for a new trial. Hayat was sentenced to 288 months—24 years—in federal prison. That sentence included the maximum, 15-year penalty for violation of 18 U.S.C. § 2339A. After sentencing, Hayat filed a motion to vacate his convictions under 28 U.S.C. § 2255. The district court dismissed the motion without prejudice.

Hayat timely appealed his convictions but did not file a notice of appeal from the district court's later dismissal of his § 2255 motion.

## II.

As noted, Hayat raises three challenges to his conviction. First, he maintains that he was denied a fair trial because the jury's foreperson, Joseph Cote, was biased against him. Second, he asserts that the district court imposed an unconstitutional limitation on his cross-examination of the government's key witness, Naseem Khan. Finally, he contends that the district court erred in admitting expert testimony offered by the government and excluding expert testimony offered by the defense.

**A.**

Hayat argues that he is entitled to a new trial because the jury foreperson, Joseph Cote, harbored actual bias against Hayat. Hayat offers four facts as evidence of Cote's bias: (1) alleged racial and religious remarks made by Cote during deliberations; (2) post-trial statements attributed to Cote in an *Atlantic Monthly* article; (3) Cote's improper contact with alternate juror W. during deliberations; and (4) comments made by Cote during deliberations in which he indicated that he had overheard media reports about the trial.

We review the denial of a motion for a new trial based on assertions of juror bias for abuse of discretion. *United States v. Smith*, 424 F.3d 992, 1011 (9th Cir. 2005).[5] We review for clear error the district court's factual findings, *United States v. Lopez-Martinez*, 543 F.3d 509, 517 (9th Cir. 2008), including the determination of whether a juror is actually biased, *see Estrada v. Scribner*, 512 F.3d 1227, 1240 (9th Cir. 2008). "The presence of a biased juror cannot be harmless; the error requires a new trial without a showing of actual prejudice." *Dyer v. Calderon*, 151 F.3d 970, 973 n.2 (9th Cir. 1998) (en banc).

"The Sixth Amendment guarantees criminal defendants a verdict by impartial, indifferent jurors. The bias of even a single juror would violate [Hayat's] right to a fair trial."

---

[5] We note that Hayat does not argue on appeal that Cote's acts of misconduct prejudiced his trial. Instead, he argues that Cote's misconduct is evidence of his actual bias against Hayat, because it illustrates the lengths to which he was willing to go to secure a conviction. We therefore apply the standard of review applicable to claims of juror bias, not the standard applicable to denials of motions for a new trial based on juror misconduct.

*Estrada*, 512 F.3d at 1239 (internal quotation marks and alterations omitted). "Actual bias is, in essence, bias in fact—the existence of a state of mind that leads to an inference that the person will not act with entire impartiality." *Id.* at 1240 (internal quotation marks omitted). If Hayat can show that Cote "'failed to answer honestly a material question on voir dire, and then further show that a correct response would have provided a valid basis for a challenge for cause,' then [Hayat] is entitled to a new trial." *Id.* (quoting *United States v. Henley*, 238 F.3d 1111, 1121 (9th Cir. 2001)). "The central inquiry in determining whether a juror should be removed for cause is whether that juror holds a particular belief or opinion that will 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" *United States v. Padilla-Mendoza*, 157 F.3d 730, 733 (9th Cir. 1998) (quoting *Wainwright v. Witt*, 469 U.S. 412, 433 (1985)).

As evidence of Cote's bias, Hayat alleges, first, that Cote made "several inappropriate racial and religious comments during deliberations." Hayat presented evidence from Jurors L. and B., as well as from Juror H. via an affidavit by Hayat's private investigator, that Cote made a "racial" comment during deliberations. B. declared that "[d]uring the deliberation process, . . . Cote[] made the statement they all looked the same when wearing a costume or when put in a costume. I believe Mr. Cote made this statement in connection with a discussion of witness Naseem Khan's claim that he had seen Ayman al-Zawahiri in Lodi." Similarly, L. stated that "[d]uring deliberations Mr. Cote made racial slurs. As an example, on one occasion . . . he said in front of the entire group that they all look alike . . . . [i]f you put them in the same costume." H. reported to Hayat's investigator essentially the same comment by Cote, "that

when they dress alike they all look the same." B. also stated more generally that "[t]hroughout the deliberation process, Mr. Cote made other inappropriate racial comments," but, aside from the "look alike" remark, did not say what any of them were.

Generally, the Federal Rules of Evidence forbid courts from inquiring into what went on during jury deliberations. *See* Fed. R. Evid. 606(b).[6] We have not decided, as some courts have, whether Rule 606(b) prevents us from considering evidence that a juror's racial bias was expressed during deliberations. *See Henley*, 238 F.3d at 1120–21;

---

[6] In 2006, Federal Rule of Evidence 606(b) provided:

> Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith. But a juror may testify about (1) whether extraneous prejudicial information was improperly brought to the jury's attention, (2) whether any outside influence was improperly brought to bear upon any juror, or (3) whether there was a mistake in entering the verdict onto the verdict form. A juror's affidavit or evidence of any statement by the juror may not be received on a matter about which the juror would be precluded from testifying.

(Each of the Federal Rules of Evidence cited in this opinion was amended in 2011 "for purely stylistic reasons; the changes do not reflect an intent to change any result in any ruling on evidence admissibility." *See United States v. Solorio*, 669 F.3d 943, 950 n.8 (2012) (internal quotation marks omitted). Throughout the opinion, we cite the rules in effect at the time of Hayat's trial.)

*compare*, *e.g.*, *United States v. Villar*, 586 F.3d 76, 84, 87 (1st Cir. 2009) (holding that Rule 606(b) "precludes any inquiry into the validity of the verdict based on juror testimony regarding racial or ethnic comments made during the course of deliberations," but that "the rule against juror impeachment cannot be applied so inflexibly as to bar juror testimony in those rare and grave cases where claims of racial or ethnic bias during jury deliberations implicate a defendant's right to due process and an impartial jury" (internal quotation marks omitted)), *with United States v. Benally*, 546 F.3d 1230, 1236–39 (10th Cir. 2008) (holding that Rule 606(b) contains no exception for racially biased statements made during jury deliberations and expressing skepticism about whether constitutional concerns can ever override the rule).  Where, however, "a juror has been asked direct questions about racial bias during voir dire, and has sworn that racial bias would play no part in his deliberations, evidence of that juror's alleged racial bias is indisputably admissible for the purpose of determining whether the juror's responses were truthful." *Henley*, 238 F.3d at 1121 (citing *Hard v. Burlington N. R.R.*, 812 F.2d 482, 485 (9th Cir. 1987)).

During voir dire, Cote was asked whether he had, or had ever had, "any experiences, feelings or impressions about Muslims, Pakistanis, Pakistani-Americans or Islamic beliefs that would make it difficult for [him] to be a fair and impartial juror."  He responded that he had "no impressions, pre-conditions or feelings about being impartial in this case." We may consider Cote's statement that "they all look alike" when "in a costume" for the purpose of determining whether this response was truthful.

We cannot say that the district court clearly erred in concluding that Cote's statement did not indicate an actual

racial, ethnic, or religious bias. Cote did not specifically refer to race, religion, or ethnicity in making the statement, but to "they" who wear certain clothing common among Pakistanis and other Muslims. The district court reasoned that the context in which Cote's statement was made provided a nonbiased explanation for his comment: Cote was attempting to explain how Naseem Khan, the government's key witness, could have mistakenly but in good faith informed FBI agents that he had observed al-Zawahiri, an Egyptian, in Lodi, California.

Cote's statement could be interpreted as reflecting a tendency to group people together on the basis of their shared cultural or physical characteristics, while ignoring or failing to perceive the differences that define them as individuals. Statements evincing an inability or unwillingness to differentiate between members of a group are in some contexts quite problematic. *See Tobias v. Smith*, 468 F. Supp. 1287, 1289–91 (W.D.N.Y. 1979) (granting an evidentiary hearing where the jury foreperson allegedly said during deliberations that it did not matter that witnesses were unable to identify a photograph of the defendant because "[y]ou can't tell one black from another" and "[t]hey all look alike"). Nonetheless, Cote's statement was not specific as to the group referred to; ascribed no negative behavioral characteristics to Egyptians, Pakistanis, or Muslims; and conveyed no overt prejudice against those groups, focusing instead, whether accurately or not, on the nature of clothing sometimes worn by members of those groups, as obscuring individual identity. *Compare Henley*, 238 F.3d at 1113–14 (remanding for additional findings where one juror reportedly told two others that "[a]ll the niggers should hang" or "[n]iggers are guilty"). We conclude that the district court did not clearly err in finding that the "look alike" statement

was insufficient to show that Cote lied during voir dire about his lack of racial, ethnic, or religious bias. As to L.'s and B.'s assertions that Cote made "other inappropriate racial comments," these statements are simply too vague to support a finding that Cote was impermissibly biased. *See Fields v. Woodford*, 315 F.3d 1062, 1062–63 (9th Cir. 2002).

Second, Hayat asserts that other evidence of Cote's lack of impartiality and his ethnic and religious bias comes from statements he made in a post-verdict interview published in the *Atlantic Monthly* magazine. Cote stated in the interview:

> [There are] so-called new rules of engagement, and I don't want to see the government lose its case . . . . Can we, on the basis of what we know, put this kid on the street? On the basis of what we know of how people of his background have acted in the past? The answer is no.

Amy Waldman, *Prophetic Justice*, The Atlantic Monthly, Oct. 2006, at 82, 93, *available at* http://www.theatlantic.com/magazine/archive/2006/10/prophetic-justice/5234/. The article also contained the following description of Cote's views of the government's approach to the case:

> This preventive approach, Cote said, means that "just as there are people in prison who never committed the crime, this may also happen. Not this particular case, I'm saying, but future cases." He argued that it was "absolutely" better to run the risk of convicting an innocent man than to let a guilty one go. "Too many lives are changed" by

> terrorism, he said. "So shall one man pay to
> save fifty? It's not a debatable question."

*Id.* Hayat maintains that these statements demonstrate that Cote "harbored a general bias against Muslims and Pakistanis" and that Cote was willing "to engage in impermissible preventative conviction."

The district court conducted an evidentiary hearing at which it questioned Cote about these comments. To avoid Rule 606(b) issues, the court did not ask Cote whether he made the statements.[7] Rather, the court said, "Assume for the sake of responding to the question I will ask you that you made these statements. Did you have those thoughts at any time prior to the commencement of jury deliberations?" Cote responded, "Definitely not." Finding that "Cote's testimony [at the evidentiary hearing] was credible," the district court concluded:

> Even assuming Cote made all of the
> statements in the *Atlantic Monthly* article,
> when read as a whole, the article reveals that
> the jurors, and Cote himself, thoroughly and
> thoughtfully deliberated regarding Hayat's
> guilt or innocence. The statements in the
> article do not reveal that Cote had a racial or

---

[7] It is not clear to us why the district court thought Rule 606(b) could apply to bar the introduction of statements made after deliberations were over. Whether those statements could then be used to make inferences about the deliberation process is, of course, a different question.

religious bias against Hayat, that he was
dishonest during voir dire, or that he was an
unfair or impartial [sic] juror.

(Footnote omitted.)

As an initial matter, the district court did not clearly err in
concluding that Cote's comment about "people of [Hayat's]
background" is not sufficient standing alone to prove that
Cote was actually biased against Muslims or Pakistanis.
Although Cote might have been referring to young Muslims
or Pakistani males in general when he used the phrase
"people of [Hayat's] background," given that he made the
statement after hearing all of the government's evidence
against Hayat, he could well instead have meant people who
have expressed anti-American views and attended terrorist
training camps. The district court did not clearly err in its
assessment of the statement.

Cote is also quoted in the *Atlantic Monthly* article as
stating that, due to the "new rules of engagement," it was
"absolutely better to run the risk of convicting an innocent
man than to let a guilty one go" free. These statements can be
read to suggest that Cote applied something less than a
"reasonable doubt" standard in deciding Hayat's case. But
Cote also specified that he was *not* referencing "this
particular case" in his remarks, and the remarks did not focus
in any way on Muslims or Pakistanis in general. So the
"rules of engagement" remarks were at best tangentially
relevant to whether Cote dishonestly answered the bias
questions during voir dire or was biased against Hayat during
trial and deliberation.

Moreover, in context, the remarks can be read as a comment not on the burden of proof but on the material support statute and the government's "preventative approach" legal theory under that statute, which permits the conviction of potential terrorists who may never in fact have committed any terrorist act if not arrested and convicted. In fact, the *Atlantic Monthly* article overall is devoted to discussing preventative criminal prosecutions of this kind, providing contextual support to an inference that Cote was commenting on such prosecutions, not on the burden of proof.[8]

We are mindful of the strong deference we owe the district court's credibility findings. *See McClure v. Thompson*, 323 F.3d 1233, 1241 (9th Cir. 2003). Particularly given that deference, as well as the consideration that the issue was Cote's impartiality as a juror at the time of the trial and not his post-trial attitudes, the non-biased explanations for Cote's statements, in context, are plausible. We therefore cannot say that the district court clearly erred in crediting Cote's denial of bias against Hayat during the trial and deliberation.

Finally, Hayat points to two instances of juror misconduct as evidence of Cote's bias. In his motion for a new trial, Hayat argued that Cote committed acts of misconduct that prejudiced the outcome of the trial. The district court held that even if there was misconduct, it was not prejudicial to

---

[8] The district court credited Cote's assertions at the evidentiary hearing that he did not have the thoughts he expressed to the *Atlantic Monthly* "before the commencement of . . . jury deliberations."

Hayat.[9]  Hayat does not challenge that determination on appeal.    Instead, he argues that Cote's misconduct, in combination with the statements discussed above, evidences his actual bias against Hayat.[10]

First, Hayat maintains that Cote engaged in intentional misconduct during deliberations when, in violation of the court's express instructions, he contacted alternate juror W., who had been dismissed from the jury when the jury retired. Hayat's private investigator submitted an affidavit declaring that W. described the incident as follows:

> Joe Cote called me . . . on April [20,] 2006 and left a voicemail message asking me to call him.  I returned the call a few minutes later. When Joe answered, I asked him if the trial was over.  He said no, he just wanted to ask me about a remark I had made predicting that the jury would have a difficult time during deliberations. . . . [H]e said I had indicated, with a nod of my head, someone sitting to my left (at the table in the jury room).  I said, "Oh, [L.]."  Joe said [L.] was no problem; she was a very deep thinker.  He said he thought I had been referring to [B.], and that she had been causing a lot of trouble.  I expressed surprise, and Joe said he, too, was surprised

---

[9] Unlike the presence of juror bias, juror misconduct can be harmless error that does not require a new trial.  *See Sassounian v. Roe*, 230 F.3d 1097, 1108 (9th Cir. 2000).

[10] Hayat also made this alternative argument in his motion for a new trial.

by her actions.  He asked if I had heard anything specific that prompted the remark about [L.].  I said no, it was just my perception.  I told Joe the alternate jurors had been instructed not to speak to the jurors until the trial was over.  At that point, we concluded the conversation.[11]

Hayat maintains that Cote's willingness to disregard the court's orders and seek advice from W. about "problem" jurors is evidence of his bias.  He points to *United States v. Vartanian*, 476 F.3d 1095 (9th Cir. 2007), in which we held that the district court did not abuse its discretion in dismissing a juror who had committed misconduct.  In *Vartanian*, the juror in question had spoken to members of the defendant's family, defense counsel, and the defendant himself during the course of the trial; when questioned about these contacts by the district court, she denied and minimized them.  *Id.* at 1098–99.  The district court dismissed the juror because it was "unwilling to trust [her] to be a fair and impartial juror." *Id.* at 1097.  We affirmed the defendant's conviction, holding that it was within the district court's discretion to dismiss the juror "because of her misconduct."  *Id.* at 1099.  We did not express any opinion as to whether the juror's behavior established that she was biased.

Even if we had concluded that the *Vartanian* juror's misconduct was evidence of bias, Cote's phone call to alternate juror W. differs in a critical regard.  In *Vartanian*,

---

[11] Although the district court conducted an evidentiary hearing at which it questioned Cote about Hayat's various allegations of misconduct, the court assumed that Hayat's representation of the conversation between Cote and W. was accurate.  We proceed on that basis.

the juror's misconduct was first reported to the district court on the second day of deliberations, but the misconduct was apparently ongoing throughout the trial. Here, in contrast, Cote did not contact W. until after deliberations had begun. Although Cote obviously committed misconduct in contacting W. to learn about "problem" jurors, his calling W. does not show that he *prejudged* the case. At most, it suggests that Cote was determined to convict Hayat *after* viewing all the evidence and the parties' closing arguments. Nor did Cote make any comments to W. suggestive of racial, ethnic, or religious bias. In short, although we assuredly do not condone Cote's conduct, once again we cannot say that the district court clearly erred in finding that it did not evidence actual bias.

Finally, Hayat contends that Cote's comments, during deliberations, about media coverage of the trial also demonstrate his bias against Hayat. Hayat offered evidence, again from Jurors L. and B., that Cote had made references to media reports. B. stated,

> At one point during deliberations, Mr. Cote began to discuss something he had learned from media reports about Mr. Hayat's attorney, Wazhma Mojaddidi. Other jurors and I told Mr. Cote that he should not be reading or listening to media reports of the trial, and that he should not be discussing such reports with fellow jurors.

L. provided a similar report, adding that "Mr. Cote explained that his wife had the TV on in the room next door and he happened to hear about the story by accident."

Assuming, as the district court did, that the evidence provided by Jurors L. and B. is accurate, Cote committed misconduct by sharing with the other jurors something he had overheard in a media report. Once again, however, this misconduct occurred during deliberations and does not show that Cote prejudged the case. Moreover, the information he communicated concerned Hayat's lawyer, not Hayat, and was accidentally rather than deliberately obtained. Both of these circumstances undermine any inference of bias against Hayat arising from Cote's disregard of instructions given to jurors regarding contact with media reports of the trial.

Hayat maintains nonetheless that Cote's misconduct as a juror, in combination with his "racial" statements during deliberations and his *Atlantic Monthly* interview, demonstrates that he harbored an impermissible bias against Hayat. He argues that the district court engaged in a "divide-and-conquer" analysis and failed to aggregate the evidence of bias. But the district court expressly recognized that "[t]he determination as to whether a juror is biased must be founded on an examination of all relevant evidence of bias and misconduct in the aggregate rather than in isolation" (citing *Green v. White*, 232 F.3d 671, 678 (9th Cir. 2000)). Even considering all the evidence together, the district court concluded that "Hayat has not shown that Cote was not a fair and impartial juror."

That finding was not clearly erroneous. Although the evidence Hayat points to, taken together, may demonstrate that Cote was confident in his decision to convict, it does not establish that Cote was determined to convict before the close of evidence, or that Cote was actually biased against Hayat on account of his race, ethnicity, or religion. The district court

did not clearly err in determining that Cote was not motivated by an impermissible racial, ethnic, or religious bias.

**B.**

As discussed above, seven recorded conversations between Hayat and Khan were introduced into evidence. On direct examination, the government questioned Khan about these and other conversations, both recorded and unrecorded.[12] During cross-examination, the district court prevented Hayat on three occasions from questioning Khan about out-of-court statements Hayat had made to Khan. Specifically, Hayat sought to elicit from Khan testimony about whether Hayat ever told him that he attended a camp run by Tablighi Jamaat, a non-Jihadist religious organization, and about whether Hayat had made a statement to Khan in October 2003 that "he never intended to go to a camp."

First was the following exchange:

> Q. BY MS. MOJADDIDI [Hayat's counsel]: Do you now recall calling Hamid Hayat's house on October 7, 2003 while he was in Pakistan?
>
> A. [KHAN]: Yes.
>
> Q. And then do you recall Hamid telling you—

---

[12] Although not all the conversations were recorded, the government produced contemporaneous records of the unrecorded conversations in the form of Khan's own notes, agents' notes from his FBI debriefings, or both.

MS. FERRIS [Prosecution]:     Objection. Hearsay.

. . . .

MS. MOJADDIDI:     Your Honor, it's not being offered for the truth, it's being offered to show the effect the statement had on the listener, on Mr. Khan.

. . . .

It's relevant because, as the witness is testifying, he made repeated phone calls, and made repeated inquiries to the defendant, and this is a statement that was made to him by the defendant in response to his inquiries.

THE COURT:  Sustained.

Q. BY MS. MOJADDIDI:     During that conversation, did you ask Hamid Hayat if he was at a camp during that conversation?

A. Don't remember.

Q. Do you have any reason to believe—did you have any reason to believe at the conclusion of that conversation that Hamid Hayat had attended a terrorist training camp?

MS. FERRIS: Objection. Foundation. And she's angling towards the hearsay issue again.

. . . .

MS. MOJADDIDI:    It's—to the hearsay, again, it's not being offered for the truth, it's being offered to what his impression was.  It's an operative fact of why the—the steps that he made, the phone call that he made that day, and the phone calls before this, the phone calls after this.

     It just shows what he was doing in his role as an informant with the defendant. . . .

THE COURT:  Sustained.

Q. BY MS. MOJADDIDI:  Did you also call Hamid Hayat on October 8, 2003?

A. Yes, I did.

Q. You didn't get a hold of Hamid on that date, did you?

A. Don't remember.

Q. Did Hamid ever tell you he attended Tablighi Jamaat camp?

MS. FERRIS:    Objection.    That's the hearsay—may we approach?

THE COURT:  Yes.

(Bench conference.)

MS. FERRIS: Laura Ferris for the government, Your Honor.

The recent objections and the attempts of counsel related to bringing in Hamid's statements that he attended a Tablighi Jamaat, which is a group of people that travel around from mosque to mosque, and they do, I'm paraphrasing, essentially missionary work within the Islamic faith, and to the extent that Hamid made those statements to [Khan], they are being offered for the truth of the matter asserted. And she has tried numerous ways to get at that issue when there is, in fact, no exception to the hearsay rule under these circumstances.

I can offer, if you will, the conversation she's referring to in summary format, if it's helpful to the Court, but there is simply no hearsay exception to it.

MS. MOJADDIDI: Your Honor, this witness has testified that he relied on a number of statements that Hamid Hayat made in his role as an informant and the information that he gave to the FBI. This is a—this statement is a statement that Hamid made to him, and it affected the rest of the investigation against Hamid. And for that reason it's not being offered for the truth of the matter, it's being offered to show how he—why he proceeded to conduct the rest of his duties as an informant in this investigation even beyond

this date.  He continually relied on the defendant's statements in each move that he made. So it goes to his—it goes to explain his conduct as an informant.

. . . .

THE COURT:  Sustained.

The second instance occurred over a week later, again in Khan's testimony on cross-examination:

Q. BY MS. MOJADDIDI:  You testified on direct that one time you talked to Hamid over the telephone while he was in Pakistan, and he told you that he was actually at a Tablighi Jamaat camp.  Do you recall that on direct?

MS. FERRIS: Objection. Foundation. And may we approach, Your Honor?

THE COURT:  Okay.

(Bench conference.)

MS.  FERRIS:    Laura  Ferris  for  the government, Your Honor.  If you'll recall, during an earlier part of cross-examination, Ms. Mojaddidi attempted to get into a hearsay statement concerning Hamid and Tablighi Jamaat, and this Court sustained that objection and found it was inappropriate hearsay information.  She is now again eliciting this information in the form of a question, and

going over a topic which the Court has previously ruled was not appropriate.

So the Court—the government asks the question be stricken and she be admonished from going into that area again.

. . . .

MS. MOJADDIDI: . . . At the time when the Court—when the government made the objection and the Court made its ruling, I did not recall that that specific question, that specific topic, was covered word for word by counsel for the government on direct examination. And all I am doing is going back to that. I am not eliciting anything new.

. . . .

THE COURT: The hearsay rule allows the government to introduce a statement against your client, but it does not allow you to use a statement that—for the truth of the matter asserted therein in favor of your client. That is hearsay.

. . . .

THE COURT: Sustained.

Shortly after this exchange, the district court sustained a third hearsay objection:

Q.  BY MS. MOJADDIDI:  I asked you earlier about a conversation that took place on October 7, 2003, when you called Hamid while he was at Pakistan.  That was the last time that you contacted him between that date and then May 31st of 2005, correct?

A. [KHAN]: It was in October.  I don't remember the exact date.

Q. During that October 7th conversation, Hamid told you that he never intended on going to a camp, and he was lying to you all along, didn't he?

MS. FERRIS:  Objection.  Foundation. Hearsay.  Move to strike.

THE COURT:  Sustained.  It's stricken.

Hayat argues that the district court erred in two ways with respect to these rulings: (1) by preventing Khan from answering on cross-examination questions about whether Hayat ever told him that he attended a camp run by Tablighi Jamaat, a non-Jihadist religious organization; and (2) by preventing Khan from answering on cross-examination the question whether Hayat told him in October 2003 that he never intended to go to a camp.

The first objection is easily dispatched.  Regardless of whether the district court ought to have permitted Khan during cross-examination to answer questions regarding Hayat's statements about Tablighi Jamaat, the information Hayat's counsel sought to elicit was already in the record.  On

direct examination, Khan testified that Hayat had told him that he had attended a Tablighi Jamaat camp:

> Q. BY MS. FERRIS: Do you recall what Hamid Hayat said about Tablighi Jamaat?
>
> A. [KHAN]: One time when I talked to him over the phone when he was in Pakistan, he actually was—went to Tablighi Jamaat.
>
> Q. And did he indicate to you how long he was there?
>
> A. I'm sorry, I can't recall right now.

In responding to the prosecutor's objection during cross-examination, Hayat's counsel specifically stated that she was "not eliciting anything new." Therefore, any error in failing to admit the testimony again on cross-examination could not have been prejudicial, as the information was already in the record.

Whether the district court ought to have admitted Hayat's statement that "he never intended on going to a camp" is a closer question. On appeal, Hayat argues that the statement should have been admitted to prove his then-existing intent, *see* Fed. R. Evid. 803(3), and also under the so-called rule of completeness, *see* Fed. R. Evid. 106.

**1.**

Although "[w]e generally review a district court's evidentiary rulings for abuse of discretion," *United States v. Boulware*, 384 F.3d 794, 800–01 (9th Cir. 2004), the

government urges us to apply a plain error standard here. We should review the district court's rulings for plain error, the government argues, because Hayat's proffered grounds on appeal for admitting the statement were not raised at trial. We agree.

Federal Rule of Criminal Procedure 51(b) provides that "[a] party may preserve a claim of error by informing the court—when the court ruling or order is made or sought—of the action the party wishes the court to take, or the party's objection to the court's action *and the grounds for that objection*." Fed. R. Crim. P. 51(b) (emphasis added). Additionally, Rule 51(b) states that "[a] ruling or order that admits or excludes evidence is governed by Federal Rule of Evidence 103." *Id.*[13] Federal Rule of Criminal Procedure 52(b) provides that even if a claim of error was not preserved, an appellate court may consider a "plain error" affecting "substantial rights." Fed. R. Crim. P. 52(b).

Hayat maintains that under Federal Rule of Evidence 103, the *only* requirement for preserving an objection to a ruling excluding evidence is that "the substance of the evidence was made known to the court by offer or was apparent from the context within which questions were asked." Fed. R. Evid. 103(a)(2) (2006). Applying this understanding, Hayat contends that in this case defense counsel adequately

---

[13] The language of Rule 51 was amended "as part of the general restyling of the Criminal Rules" in 2002. Fed. R. Crim. P. 51, advisory comm. notes (2002). The changes were "intended to be stylistic only." *Id*. The cross-reference to Federal Rule of Evidence 103 was added "because of concerns about the Supersession Clause, 28 U.S.C. § 2072(b), of the Rules Enabling Act, and the possibility that an argument might have been made that Congressional approval of [the amended Rule 51] would supersede that Rule of Evidence." *Id.*

preserved the error by making clear the *content* of the excluded statements, although counsel did not apprise the court of the grounds on which he now argues that the statements should have been admitted.

Rule 103 states that an offer of proof is a prerequisite to challenging excluded evidence, but it does not state that it is the only prerequisite. Moreover, like Federal Rule of Criminal Procedure 52(b), Rule 103 provides that where "errors . . . were not brought to the attention of the court" plain error review standards apply. Fed. R. Evid. 103(d) (2006).[14]

The Supreme Court has held in the civil context that challenges to evidentiary rulings are governed by *both* Rule of Evidence 103 and Federal Rule of Civil Procedure 46, the civil rule directly corresponding to Federal Rule of Criminal Procedure 51, which likewise requires a party objecting to a ruling to state the grounds for his objection. *See Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 174, 175 n.22 (1988) ("We have no quarrel with the proposition that counsel must articulate the grounds on which evidence should be admitted."). There is no reason why the standard should be any different in the criminal context. *See* Fed. R. Crim. P. 51, advisory comm. notes (1944) ("This rule is practically identical with rule 46 of the Federal Rules of Civil Procedure . . . . It relates to a matter of trial practice which should be the same in civil and criminal cases in the interest of avoiding confusion."). The addition of a cross-reference to Federal Rule of Evidence 103 in the criminal rule but not the civil rule cannot matter, as that amendment was made in the course

---

[14] The plain error standard is now codified at Federal Rule of Evidence 103(e).

of an overall stylistic revision of the criminal rules and was added only to ensure that Rule 103 remained applicable as before. *See* Fed. R. Crim. P. 51, advisory comm. notes (2002).

Indeed, we have generally reviewed such evidentiary rulings "challenged on appeal on grounds not raised in the district court" for plain error. *United States v. Reese*, 2 F.3d 870, 892 (9th Cir. 1993). In *United States v. Chang*, for example, we noted that the defendant "never informed the district court that he was offering the testimony in question as a party-opponent admission (or for any other nonhearsay purpose or under any exception to the hearsay rule, for that matter)." 207 F.3d 1169, 1176 (9th Cir. 2000). Quoting an earlier case that held that "'[i]f a party fails to state the specific grounds upon which evidence is admissible, the issue is not preserved for review, and the court of appeals will reverse only for plain error,'" *id.* (quoting *Arizona v. Elmer*, 21 F.3d 331, 334 (9th Cir. 1994)), *Chang* held that the exclusion of the testimony at issue could "be reviewed only for plain error," because although its content was apparent, the justification for its admission was not. *Id.*

We have indicated that the same principle continues to apply since the amendment to Rule 51, *see United States v. Bonds*, 608 F.3d 495, 502 (9th Cir. 2010), and we apply it here. Hayat put forward a reason for admitting the statement at trial—to explain why Khan acted the way he did—entirely different from the grounds he now advances on appeal. When a party gives an invalid reason for admitting a statement at trial, the district court is not required to come up on its own with alternative grounds on which the statement could be admitted, unless failing to do so would constitute plain error. We therefore review the district court's

exclusionary rulings for plain error. *See Reese*, 2 F.3d at 892. In so doing, we do not decline to consider the challenged rulings altogether; we simply review them under a somewhat more deferential standard.[15]

"Under a plain error standard, relief is not warranted unless there is: (1) an error; (2) that was plain; and (3) that affected the defendant's substantial rights." *United States v. Tran*, 568 F.3d 1156, 1163 (9th Cir. 2009) (citing *Jones v. United States*, 527 U.S. 373, 389 (1999)). "Even if these conditions are met, reversal is discretionary and will be granted only if the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Id.* (internal quotation marks omitted). We reach here only the first two prongs of the plain error test, and so do not decide whether Hayat's substantial rights were affected.

**2.**

Hayat maintains on appeal that the statement that he "never intended on going to a camp" was admissible under Federal Rule of Evidence 803(3), as a declaration of his then-existing state of mind. We cannot say that refusing to admit the excluded statement as a declaration of current state of mind was plain error.

In 2006, Rule 803(3) provided that "[a] statement of the declarant's then existing state of mind . . . (such as

---

[15] Nor, of course, do we preclude a demonstration on collateral review that counsel rendered ineffective assistance in enunciating the basis for admission as she did. Hayat's attorney may well have been deficient by failing to offer a plausible justification for admission of the "never intended" statement.

intent . . . )" is "not excluded by the hearsay rule." Fed. R. Evid. 803(3) (2006). The state-of-mind exception does not include "a statement of memory or belief to prove the fact remembered or believed." *Id.*

On its face, the statement "I never intended on going to a camp" is backward-looking, expressing Hayat's memory of his earlier states of mind, and so is not admissible under Rule 803(3). Hayat argues, however, that in the context of Khan's repeated and emphatic urging that Hayat go for training, the statement also communicated Hayat's present intent not to attend a training camp. Hayat offers an example to illustrate this point: If someone asked you when you were going to the movies today and you responded, "I never intended to go to the movies today," your response, despite the use of past tense, could be understood as communicating your present intent not to go to the movies.

Hayat's interpretation of the statement he sought to elicit, however, is far from obvious, as it is inconsistent with ordinary grammar. The statement could quite reasonably be understood as purely retrospective. To illustrate, in the example, one could follow the sentence, "I never intended to go to the movies," with the statement, "But I will go," or one could harbor that changed intent but not communicate it without being duplicitous.

Moreover, even under the state-of-mind exception, the statement could only have been admitted with a limiting instruction: it was not admissible for the purpose of proving Hayat's earlier states of mind, including whether he had lied earlier when he said that he did intend to go. Hayat never asked for a limiting instruction, making it all the more likely that the statement would be understood by the district court

in its retrospective sense. Given the retrospective language used in the statement Hayat sought to admit and the failure to clarify, by offering a limiting instruction, that only the present-tense meaning was intended, we cannot say that the district court plainly erred in failing to admit it under the state-of-mind exception. *See Smith*, 424 F.3d at 1002 ("[A]n error is not plain unless it is 'clear' or 'obvious.'" (quoting *United States v. Olano*, 507 U.S. 725, 734 (1993)); *United States v. Turman*, 122 F.3d 1167, 1170 (9th Cir. 1997) ("Plain error . . . is error that is so clear-cut, so obvious, a competent district judge should be able to avoid it without benefit of objection.").

Hayat also contends that the excluded statement was admissible under the rule of completeness. *See* Fed. R. Evid. 106 (2006) ("When a writing or recorded statement or part thereof is introduced by a party, an adverse party may require the introduction at that time of any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it."). As Hayat acknowledges, however, our cases have applied the rule of completeness "only to written and recorded statements." *United States v. Ortega*, 203 F.3d 675, 682 (9th Cir. 2000). Moreover, Rule 106 "does not compel admission of otherwise inadmissible hearsay evidence." *United States v. Collicott*, 92 F.3d 973, 983 (9th Cir. 1996) (internal quotation marks omitted). Thus, the district court did not err in failing to admit the excluded statement under the rule of completeness.

Judge Tashima maintains in dissent that the excluded statement was also admissible for the purpose of impeachment under Federal Rule of Evidence 607. *See* Dissent at 65–66. But even if this evidence could have been admissible under Rule 607, Hayat did not raise this limited

basis for admissibility at trial *or* on appeal. We therefore need not address the contention.

In any event, the exclusion was not plain error. The dissent suggests that the district court should have known that the statement was admissible for impeachment purposes even if Hayat's counsel did not request admission for that limited purpose, for the following reason: Khan testified that when he called Hayat a liar, he was merely teasing or joking—he did not actually think Hayat was lying, at least about significant points such as whether Hayat attended a training camp. Such testimony was elicited on direct examination on February 28, 2006 and on cross-examination on March 2, 2006. According to the dissent, the "never intended" statement impeached this aspect of Khan's testimony, by demonstrating that Khan had been told, by Hayat, that Hayat had in fact been lying as to whether he intended to go to a training camp.

First of all, it was not until more than a week after Khan's testimony about whether he believed Hayat to be a liar, on March 10, 2006, that Hayat's counsel sought to introduce Hayat's statement that he "never intended" to go to a training camp. Thus, for the district court to recognize that the statement might be admissible for impeachment purposes, the judge would not only have had to know that hearsay evidence is admissible for impeachment purposes—which of course he would have—but he would also have had to remember Khan's testimony, given over a week previously. He would then have had to recognize that the statement Hayat sought to introduce could be understood as in tension with that testimony, even though it concerned a different conversation than the "liar" conversation, about a somewhat different matter, and even though the question whether Khan had

reason to believe that Hayat was a braggart or a liar is quite peripheral to whether Khan was truthful as to the objective facts he reported, as well as to whether Hayat *was* a braggart or a liar.

Moreover, Hayat's counsel not only failed to indicate an impeachment purpose for the introduction of the evidence, she indicated otherwise—that she sought admission of the evidence either to explain the effect of the statement on Khan's investigation of Hayat or for the truth of the matter asserted. She did not indicate that Khan had testified to anything that contradicted the evidence she sought to introduce. The district court therefore had no occasion—on any legal ground, enunciated or not—to consider whether the contested statement could be introduced only to impeach Khan with regard to whether he actually thought Hayat was a liar, a much more limited—and peripherally relevant—purpose than the use Hayat's counsel sought to make of the statement.

Under these circumstances, the failure of Hayat's attorney to explain the connection between the proffered statement and Khan's prior testimony may be relevant to a later claim for ineffective assistance of counsel.[16] But the district court's failure to recognize such a basis on its own was not plain error.

---

[16] We cannot determine from the current record why defense counsel did not attempt to justify the admission of Hayat's statements on the bases now asserted. In order to determine whether such failure constituted ineffective assistance of counsel, further factual development not possible on direct appeal is necessary.

Aside from his arguments for admissibility under various evidentiary rules, Hayat also suggests on appeal that the district court's hearsay ruling was a limitation on his cross-examination of Khan that violated his rights under the Confrontation Clause. This argument too fails.

First, the district court's hearsay rulings overall did not deny Hayat his right to confront Khan "in the traditional sense." *United States v. Lopez-Alvarez*, 970 F.2d 583, 587 (9th Cir. 1992). Hayat had the opportunity to engage in extensive cross-examination. The jury was aware that Khan was a paid FBI informant and that the FBI was his sole employer for several years. In addition, Khan admitted that he had previously been convicted of a crime involving the passing of fraudulent checks. "Generally, once cross-examination reveals sufficient information with which to appraise a witness's possible bias and motives, confrontation demands are satisfied."[17] *Id.* (quoting *United States v. Bonanno*, 852 F.2d 434, 439 (9th Cir. 1988)). The excluded testimony in no way went to the heart of why Khan was testifying or whether he was lying, and the permitted cross-examination of Khan "was adequate to develop the issue of bias properly to the jury." *Davis v. Alaska*, 415 U.S. 308, 318 (1974); *see also Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986) ("[T]rial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on . . . cross-examination based on concerns about, among other things . . . interrogation that is repetitive or only marginally relevant.").

---

[17] We note that this conclusion is *not* tantamount to a determination that the exclusion of the evidence could not have affected the outcome of the trial. Rather, our holding here is based only on the limited nature of the Confrontation Clause guarantee.

Second, "the excluded testimony [primarily] served the purpose of furthering the theory of the defense and not of impeaching the prosecution's witness." *United States v. Lopez-Alvarez*, 970 F.2d 583, 587 (9th Cir. 1992). Hayat does not argue on appeal that the excluded testimony indicated that Khan had misreported any of Hayat's earlier statements regarding his intent to go to a terrorist training camp or was otherwise unreliable in his account of his relationship with Hayat. Instead, Hayat maintains that in her cross-examination of Khan, and later in her closing argument, defense counsel sought to demonstrate that Hayat was a braggart and a storyteller who never sincerely intended to train for jihad and never did, and that the statement that Hayat "never intended on going to a camp" fit neatly into this theory. As noted, however, under the hearsay rules, the October 7, 2003 statement could only be introduced for its truth, if at all, with respect to Hayat's intention on that day. Hayat's constitutional argument, at bottom, seeks to explain why the statement should have been admitted for both Hayat's then-present intent, as well as his previous intent, and so is better framed as "directed at demonstrating a denial of [the] . . . guarantee of 'a meaningful opportunity to present a complete defense.'" *Id.* at 587–88 (quoting *California v. Trombetta*, 467 U.S. 479, 485 (1984)).[18]

---

[18] As we noted in *Lopez-Alvarez*, there is in the case law "confusion regarding whether a defendant's right to a meaningful opportunity to present a complete defense is derived from the right of confrontation or the right to due process." *Lopez-Alvarez*, 970 F.2d at 588 n.4. The lack of clarity we perceived then remains. *See Holmes v. South Carolina*, 547 U.S. 319, 324 (2006) ("'Whether rooted directly in the Due Process Clause of the Fourteenth Amendment or in the Compulsory Process or Confrontation Clauses of the Sixth Amendment, the Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense.'" (quoting *Crane v. Kentucky*, 476 U.S. 683, 690

As we recognized in *Lopez-Alvarez* and again in *Chia v. Cambra*, 360 F.3d 997, 1003, 1006 (9th Cir. 2004), "[e]ven when evidence is excluded on the basis of a *valid* application of the hearsay rules, such exclusion may violate due process if the evidence is sufficiently reliable and crucial to the defense." *Lopez-Alvarez*, 970 F.2d at 588 (citing *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973)).

Here, however, the excluded evidence—Hayat's statement that he "never intended on going to a camp"—is not sufficiently reliable to meet the *Chambers* standard. In *Chambers*, the state court prevented the defendant in a murder prosecution from presenting three witnesses who would testify that another man had confessed to each of them separately that he was the murderer. 410 U.S. at 292–93. In holding that the exclusion of the evidence violated the defendant's due process rights, the Supreme Court emphasized the reliability of the excluded statements: the confessions were made spontaneously to close acquaintances shortly after the murder occurred, each confession was corroborated by some other evidence in the case, and "each confession . . . was in a very real sense self-incriminatory and unquestionably against interest." *Id.* at 300–01. Following *Chambers*, our cases holding hearsay evidence unconstitutionally excluded because essential to the presentation of a defense have insisted that such evidence bear "persuasive assurances of trustworthiness," *Chia*,

---

(1986))). As in *Lopez-Alvarez*, in light of this confusion, we consider Hayat's Sixth Amendment right of confrontation argument adequate to invoke on appeal the right to present a complete defense. *Lopez-Alvarez*, 970 F.2d at 588 n.4. In doing so, we once again refer to the right to present a complete defense as a "due process right" for simplicity's sake and "do not decide the source of the right." *Id.*

360 F.3d at 1006 (internal quotation marks omitted); typically, the cases involve inculpatory statements by third parties, *see Lunbery v. Hornbeak*, 605 F.3d 754, 761 (9th Cir. 2010); *Chia*, 360 F.3d at 1004.

Here, the contested statement lacked the requisite "persuasive assurances of trustworthiness." To begin with, the statement was exculpatory as to the speaker, Hayat, not inculpatory. Nor has Hayat pointed to evidence corroborating the excluded statement.

The only suggestion as to why the statement might be reliable came from the government at trial: The prosecutor argued in closing that

> Hamid Hayat considered Naseem Khan to be his, quote, best friend. . . . Hamid Hayat thought he could trust Naseem Khan. . . . He let his guard down. He spoke openly. He spoke freely. And when you hear the words that Hamid Hayat said during his conversations with Naseem Khan, you get a chance to see the real Hamid Hayat.

But the statement Hayat attempted to introduce was made on October 7, 2003, apparently the last time Hayat spoke with Khan before returning to the United States in May 2005. The record contains very little information about why the communications between Khan and Hayat lapsed for more than a year and a half right after the contested conversation. Hayat asserts that one can infer—there was no evidence to this effect—that he broke off communication with Khan because he was tired of Khan's insistence that he go to a training camp. It is an equally plausible inference,

however—again, the trial evidence is silent as to this point—that Hayat had grown suspicious of Khan, because of that very insistence or for some other reason, and so cut off the relationship. In that case, Hayat could have lied when he said he never intended to go to a camp, hoping to throw Khan off his trail just before he stopped speaking with him entirely.

In short, Hayat's statement was not sufficiently reliable to satisfy the standard developed in the *Chambers* line of cases, and the district court did not commit constitutional error by excluding it. Because we hold that the district court did not plainly err in its hearsay rulings, we do not reach the question whether the exclusion of evidence affected the outcome of the trial.

**3.**

As part of his argument that the district court erred in limiting the cross-examination of Khan, Hayat contends the district court improperly restricted discovery of classified information about Khan under the Classified Information Procedures Act ("CIPA"), 18 U.S.C. app. 3. The government must disclose classified information only if it is "'relevant and helpful to the defense of an accused.'" *United States v. Klimavicius-Viloria*, 144 F.3d 1249, 1261 (9th Cir. 1998) (quoting *United States v. Yunis*, 867 F.2d 617, 623 (D.C. Cir. 1989)). We have reviewed the classified material that the district court reviewed when it granted the government's motion for a protective order under CIPA, and conclude that the information it contains would not have been helpful to the defense. The district court did not err in precluding discovery of the information or in limiting Hayat's cross-examination of Khan concerning it.

## C.

Finally, Hayat argues that the district court erred when it (1) permitted the government's expert, Khaleel Mohammed, to testify about the meaning and implications of the Arabic note found in Hayat's wallet; (2) did not allow Hayat's expert, Anita Weiss, to testify that the note was a *ta'wiz*; and (3) excluded the testimony of defense expert James Wedick, a former FBI agent.  We review for abuse of discretion a district court's decision to admit or exclude expert testimony. *See United States v. Seschillie*, 310 F.3d 1208, 1211 (9th Cir. 2002).

## 1.

Prosecution witness Khaleel Mohammed, an expert in Islamic studies, provided a translation of an Arabic note found in Hayat's wallet upon Hayat's return from Pakistan. He testified that the note was a supplication reading: "Oh Allah we place you at their throats and we seek refuge in you from their evils."[19]  Mohammed further opined that the "kind of person" who would carry that supplication would be one "who perceives him or herself as being engaged in war for God against an enemy."  He testified that the fact that the supplication was being carried in a wallet meant that "[t]he person was completely ready" to commit "an act of warfare against a perceived enemy."

---

[19] Mohammed noted that the Arabic letters were accompanied by diacritical marks, typically used to aid non-native speakers of Arabic in pronunciation of Arabic words.  He surmised that the writing was likely intended to be "read ritually" or "memorized" rather than simply carried as a charm, as is a *ta'wiz*.

As Hayat did not object to the admission of Mohammed's testimony at trial, we review the admission of the testimony for plain error. *See Reese*, 2 F.3d at 892. Hayat challenges the admission of Mohammed's testimony on two grounds. First, he contends that Mohammed's testimony was inadmissible under Federal Rule of Evidence 702 because it exceeded the scope of Mohammed's expertise and was not reliable. In 2006, Rule 702 provided:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Mohammed's analysis of the meaning of the supplication was well within the scope of his expertise. Mohammed is a professor of Islamic studies at San Diego State University and has earned several advanced degrees in the field. He is fluent in both modern and classical Arabic and has served as an imam at a mosque in the United States. Mohammed testified that he had interpreted between 50 and 500 supplications and that he had interpreted Islamic texts "from a faith-based perspective, as well as from an academic perspective."

Mohammed also used reliable methods. To interpret the supplication, he relied on (1) his own extensive knowledge of

Arabic and Islamic law, (2) a thorough review of relevant Islamic source materials, and (3) the opinions of other academics and religious scholars.   At trial, Mohammed testified in detail about his methods.

We reject Hayat's arguments that because Mohammed was not an expert on Pakistani culture and did not speak Urdu (the national language of Pakistan), he was unqualified to offer his opinions about the note found in Hayat's wallet. Mohammed did not testify about Pakistani culture or anything written in Urdu.  He testified about the meaning of an Islamic supplication written in Arabic, a topic squarely within his expertise.   The district court did not err in admitting Mohammed's testimony under Rule 702.

Second, Hayat contends that Mohammed's testimony ran afoul of Rule 704(b).  In 2006, that Rule provided: "No expert witness testifying with respect to the mental state or condition of a defendant in a criminal case may state an opinion or inference as to whether the defendant did or did not have the mental state or condition constituting an element of the crime charged or of a defense thereto."  Mohammed testified that the "kind of person" who would carry the note found in Hayat's wallet was "[a] person who is engaged in jihad"; that such a note would be used "[b]y people who perceive themselves in a state of war"; and that a person who carried such a note "was in the act of being a warrior."  We might well agree with the dissent, *see* Dissent at 75, that these and similar statements made by Mohammed could be held to violate Rule 704(b) were we considering the scope of that rule ab initio.

But we are not.  Our caselaw has interpreted that rule much more narrowly than its text might indicate.  Under our

precedent, Rule 704(b) "does not bar testimony supporting an inference or conclusion that a defendant does or does not have the requisite mental state, 'so long as the expert does not draw the ultimate inference or conclusion for the jury and the ultimate inference or conclusion does not necessarily follow from the testimony.'" *United States v. Younger*, 398 F.3d 1179, 1189 (9th Cir. 2005) (quoting *United States v. Morales*, 108 F.3d 1031, 1038 (9th Cir. 1997)). In *Younger*, for example, the jury was required to decide whether the defendant possessed cocaine base with the intent to distribute it. An expert witness for the prosecution testified that "[t]he person, individual, whoever possessed this, possessed it for the purposes of selling." *Id.* (emphasis removed). We upheld the admission of the testimony because "the expert never directly commented on *defendant's* mental state, and the jury could have accepted his testimony and still infer that defendant was atypical." *Id.* at 1190.

Similarly, in *United States v. Gonzales*, we held that expert testimony that a "person [who] was carrying those items [was carrying them] for the purpose of distributing the drugs" did not violate Rule 704(b) because "[e]ven if the jury believed the expert's testimony, the jury could have concluded that [the defendant] was not a typical or representative person, who possessed the drugs and drug paraphernalia involved." 307 F.3d 906, 911 (9th Cir. 2002); *see also United States v. Anchrum*, 590 F.3d 795, 804–05 (9th Cir. 2009) (affirming, in a case where the defendant was charged with the possession of firearms in furtherance of drug trafficking, the district court's admission of expert testimony that "if you're driving around with a loaded weapon and you have narcotics in your car, . . . [y]ou're either going to use [the weapon]" to get away from law enforcement, as protection against getting "rip[ped] . . . off" in a drug deal

gone bad, or to protect money earned through drug deals); *United States v. Gomez-Norena*, 908 F.2d 497, 501–02 (9th Cir. 1990) (holding that it was not plain error for the district court to admit an expert's testimony that it was his "opinion" that "approximately $200,000 worth of cocaine" was "possess[ed] with intent to distribute" and not for "personal use").

Here, Mohammed testified about the kind of person who would carry a note such as the one found in Hayat's wallet, but he never commented directly on Hayat's mental state. Mohammed's testimony about the typical "person" carrying the supplication is indistinguishable in its degree of precision from the expert testimony found admissible in *Younger* and *Gonzales*. Therefore, if the district court erred at all in admitting the testimony, such error certainly was not *plain*, given our precedents limiting Rule 704(b) essentially to a semantic preclusion. Thus, while we might like to agree with Judge Tashima that the expert evidence in this case crossed the Rule 704(b) line, we are prevented from doing so by this court's caselaw.

## 2.

Defense expert Anita Weiss testified about the Pakistani practice of carrying a *ta'wiz*, which she defined as an Arabic verse or prayer used by Pakistanis as a talisman, for luck or protection, often when traveling. The defense's theory was that the note found in Hayat's wallet was a benign *ta'wiz* that Hayat had been carrying to protect himself while traveling, and that it had no jihadist import.

On direct examination, Hayat's counsel asked Weiss whether she believed that the particular writing found in

Hayat's wallet was a *ta'wiz*. The government objected, citing a lack of foundation or basis under Rule 702. The district court sustained the objection on the ground that Weiss was unqualified to evaluate the content of the writing because she did not know Arabic.

The district court did not abuse its discretion in excluding Weiss's testimony as to whether the note found in Hayat's wallet was a *ta'wiz*. First, it is undisputed that Weiss does not speak Arabic. Nor did she testify that all *ta'wiz* charms look alike or can be distinguished from other Arabic writings based on their physical appearance alone. On the contrary, she explained that such charms may take different forms and are worn or used in a variety of ways: "usually it's either something that can be tied around your neck, or it can be something . . . tied around your arm. Or else it could be something where it's phrases either from the Koran, or the Hadith, or a prayer that is mixed with water, and some people put some sugar in it, you mix it up and drink it, or you can even eat a *ta'wiz*." It was therefore reasonable for the court to conclude that she was not qualified to identify the particular note found in Hayat's wallet.

Second, contrary to Hayat's contention, Weiss was permitted to testify "about the cultural practice and meaning of carrying Arabic scriptures." She testified at length about *ta'wiz* charms, their cultural significance, their "extremely common" use by travelers, and the fact that they are written in Arabic and not Urdu. The district court only prohibited her from specifically identifying the note found in Hayat's wallet as a *ta'wiz*. It was not an abuse of discretion to exclude that portion of Weiss's testimony.

**3.**

Hayat also attempted to present James Wedick, a former FBI agent, as an expert witness. In his Rule 16 disclosure statement, Hayat stated that Wedick would testify, among other things, that "the FBI Sacramento office had the capability to videotape Hamid Hayat's interview right when it actually started"; that "the interviewing agents did not consider but should have considered [Hayat's] vulnerabilities as an interviewee"; and that the agents "all used leading questions during the interviews of Hamid Hayat." The district court excluded Wedick's testimony in its entirety, finding that much of the testimony was of "marginal probative value" and that its value was outweighed by the risk of confusing the jury, wasting time, and presenting needless cumulative evidence. The court also concluded that Wedick's testimony "would not assist the trier of fact."

The district court did not abuse its discretion in so ruling. The jurors viewed the videotapes of some sessions of Hayat's FBI interview. It would have added nothing for Wedick to testify that the Sacramento FBI office had the capability to videotape Hayat's interview in toto—that was obvious, as they did videotape the last two sessions—or that the agents "all used leading questions"—the jurors could see that for themselves. Moreover, Hayat's counsel thoroughly explored the conduct of the agents who participated in Hayat's interview, including the improper use of leading questions, during her cross-examination of those agents. Finally, as to Wedick's proposed testimony that the agents failed to consider Hayat's "vulnerabilities," the jurors again could see for themselves whether Hayat appeared tired, isolated, or naive during the videotaped interview sessions. Nor was it clear that Wedick had particular expertise in the field of false

confessions. The district court did not abuse its discretion in excluding Wedick's testimony.

## III.

After sentencing, Hayat filed a motion to vacate his convictions under 28 U.S.C. § 2255. He argued that his trial counsel, who had never before tried a federal criminal case, had a conflict of interest because she relied heavily for legal and strategic advice on the more experienced lawyer representing Hayat's father, Umer, in their joint trial. Hayat also argued that his trial counsel was constitutionally ineffective because, among other things, she did not take advantage of procedures that would have allowed her to depose potentially exculpatory witnesses in Pakistan who were unavailable for trial, and she failed to preserve objections to several of the district court's evidentiary rulings. The district court dismissed Hayat's § 2255 motion without prejudice because his criminal appeal was pending before this court. Hayat now asks us to review the district court's dismissal order.

Hayat did not timely file a notice of appeal of the district court's dismissal order, which postdated by several weeks Hayat's notice of appeal in his criminal case. *See* Fed. R. App. P. 4(a); *see also* Rule 11, Rules Governing Section 2255 Proceedings for the United States District Courts. We therefore lack jurisdiction to review the district court's dismissal of Hayat's § 2255 motion, *see United States v. Sadler*, 480 F.3d 932, 937 (9th Cir. 2007) ("Rule 4(a) . . . *is* both mandatory and jurisdictional."). This holding is, of course, without prejudice to our authority to review the district court's determinations on any later, properly filed initial § 2255 motion encompassing the claims Hayat sought

to raise in the motion dismissed without prejudice, and expresses no view as to the merits of any of those contentions.

## CONCLUSION

We affirm Hayat's convictions. We also grant the government's motion to dismiss the appeal of the order dismissing without prejudice Hayat's motion to vacate his convictions under 28 U.S.C. § 2255. We deny the government's motion to strike portions of the opening brief that cite to materials outside the record as moot.

**AFFIRMED.**

---

TASHIMA, Circuit Judge, dissenting:

To paraphrase a famous line, in this case, the government has concluded that it is not for it to say *what* offense Hamid Hayat has committed, but it is satisfied that he committed *some* offense, for which he should be punished.[1] This case is a stark demonstration of the unsettling and untoward consequences of the government's use of anticipatory prosecution as a weapon in the "war on terrorism." *E.g.*, Robert M. Chesney, *Beyond Conspiracy? Anticipatory Prosecution and the Challenge of Unaffiliated Terrorism*, 80 S. Cal. L. Rev. 425, 491 (2007) (describing the 18 U.S.C.

---

[1] A.P. Herbert, *Rex v. Haddock: Is it a Free Country?*, in THE UNCOMMON LAW 24, 28 (1935) ("It is not for me to say what offence the appellant has committed, but I am satisfied that he committed *some* offence, for which he has been most properly punished.").

§ 2339A charge against Hayat "as a sweeping form of individual inchoate crime liability"). In an anticipatory prosecution, the government "proceed[s] on an inchoate crime theory based on the harmful conduct that the government anticipates the person might commit." *Id.* at 447. The goal is to catch and punish suspects for crimes, such as the material support statute at issue here, to prevent as yet unplanned acts of terrorism the government asserts the suspect would have tried to commit had he not been prevented.

Hayat does not directly challenge this strategy of anticipatory prosecution; its propriety, therefore, is not before this court. Nevertheless, "the primary constitutional duty of the Judicial branch [is] to do justice in criminal prosecutions." *United States v. Nixon*, 418 U.S. 683, 707 (1974); *Bull v. City & Cnty. of S.F.*, 595 F.3d 964, 1004 (9th Cir. 2010) (en banc) (Thomas, J., dissenting) ("Our constitutional oath requires us to do justice–not injustice–without respect to persons."). Scrupulous fulfilment of this duty is all the more critical when the government asks a jury to deprive a man of his liberty largely based on dire, but vague, predictions that he *might* commit unspecified crimes in the future. Because this duty was not fulfilled in Hayat's trial, I would reverse the conviction and remand for a new trial. I therefore respectfully dissent.

# I

The government's theory is that Hamid Hayat, the American-born, erstwhile agricultural worker son of an immigrant ice-cream truck driver in rural Lodi, California, attended a terrorist training camp in Pakistan and returned to the United States with a "jihadi heart" and a "jihadi mind,"

intending to commit terrorist acts of some unknown sort at some unknown time in the future.  The evidence against Hayat is as follows:

His maternal grandfather runs a religious school in Pakistan.  Hayat expressed repugnant views about the murder of American journalist Daniel Pearl.  He kept a scrapbook of news articles about Pakistani politics and Islamic fundamentalism, including anti-American commentary.  In conversations with a government informant, he expressed interest in going to, and then made excuses for not attending, a terrorist training camp.  After hours of questioning, beginning around 11:00 a.m., and lasting into the early morning hours of the following day, he finally agreed with FBI interrogators, who repeatedly insisted, despite his continuing denials, that Hayat had in fact attended such a training camp.  Finally, Hayat carried in his wallet a written prayer, a saying of the prophet Mohammed, that a government expert opined would be carried only by a "jihadist," a person intent on waging war in the name of God. For this, Hayat is now serving a twenty-four-year sentence in federal prison.

Notwithstanding that the testimony of the FBI informant was the most damning evidence against Hayat, Hayat was not permitted fully to cross-examine the informant about his conversations with Hayat.  In addition, the district court allowed the government's expert witness to testify that the "kind of person" who would carry the Islamic prayer found in Hayat's wallet had "jihadi intent."  Because the district court plainly erred in preventing Hayat from introducing exculpatory evidence and in allowing inflammatory expert testimony that usurped the jury's role as finder of fact, I would reverse and remand to the district court for a new trial.

## II

At trial, the government introduced seven recorded conversations between Hayat and its star witness, FBI paid informant Naseem Khan.[2]  The government also questioned Khan about his unrecorded conversations with Hayat, of which, apparently, there were many.  Hayat's statements to Khan, combined with Hayat's meandering and almost nonsensical confession to the FBI, constitute the bulk of the evidence of Hayat's attending a terrorist training camp. Hayat's counsel attempted to cross-examine Khan about certain statements he claimed that Hayat made in unrecorded conversations.  The most important of these is the following:

> Q.  During that October 7th conversation, Hamid told you that he never intended on going to a camp, and he was lying to you all along, didn't he?
>
> AUSA FERRIS:   Objection. Foundation. Hearsay. Move to strike.
>
> THE COURT:  Sustained. It's stricken.

Responding earlier in the cross-examination to the government's objections to a similar line of questioning, Hayat's counsel argued that the excluded testimony was admissible as nonhearsay to show its effect on Khan, the

---

[2] Khan was paid more than $200,000 by the FBI.  At one point, Khan informed the FBI that he had regularly observed Osama bin Laden's second-in-command, Ayman al Zawahiri, at a mosque in Lodi, an assertion the government now concedes is false.

listener. The district court rejected this basis for admission.[3] Consequently, the prosecution was allowed to introduce inculpatory out-of-court statements Hayat made to Khan, but the defense was prevented from eliciting testimony regarding Hayat's exculpatory out-of-court statements made in the same conversation.

The majority concludes there was no plain error in refusing to admit the excluded statement "I never intended on going to a camp." Maj. Op. at 42. I disagree. In *Puckett v. United States*, 129 S. Ct. 1423 (2009), the Supreme Court explained that in order to reverse for plain error, a court must find the following: (1) there was an "error or defect–some sort of deviation from a legal rule"; (2) the error was plain, *i.e.* "clear or obvious, rather than subject to reasonable dispute"; (3) the error "affected the appellant's substantial rights, which in the ordinary case means he must demonstrate that it affected the outcome of the district court proceedings"; and (4) "the error seriously affects the fairness, integrity or public reputation of judicial proceedings," such that the court may exercise its discretion to remedy the error. *Id.* at 1429 (citing *United States v. Olano*, 507 U.S. 725 (1993)) (quotation marks, internal citations, and alterations omitted). Applying this plain error standard, I would reverse.

## A. Deviation from a Legal Rule

It is clear that the first element of the plain error analysis is satisfied – there was error, *i.e.*, deviation from a legal rule – because Khan's testimony was excluded despite being

---

[3] Hayat's counsel did not offer a basis for admission after this objection was overruled, perhaps because of the district court's ruling on the earlier objections.

admissible on two, independent bases.[4]   First, the testimony was admissible for the limited purpose of showing Hayat's then-existing intent not to go to a terrorist training camp which, under the *Hillmon* doctrine, was admissible to prove that Hayat did not, in fact, go to such a camp.  *United States v. Wash. Water Power Co.*, 793 F.2d 1079, 1082 n.4 (9th Cir. 1986) (discussing *Mut. Life Ins. Co. v. Hillmon*, 145 U.S. 285 (1892), and Fed. R. Evid. 803(3)).  Second, the testimony that Hayat said he never intended to go to a camp, and was lying to Khan all along, was admissible for the nonhearsay purpose of impeachment, because it contradicted Khan's testimony that he had no reason not to believe the things Hayat told him. Fed. R. Evid. 607.   Accordingly, the exclusion of this testimony as hearsay was error.

## 1.  *Then-Existing Intent*

Rule 803(3) provides that "[a] statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health)" is "not excluded by the hearsay rule."   Fed. R. Evid. 803(3).   The state of mind exception, of course, does not include "a statement of memory or belief to prove the fact remembered or believed." *Id.*  Accordingly, the statement, "I never intended to go to a camp," could not be admitted for the purpose of proving Hayat's earlier state of mind, including whether he lied to Khan.  But it is clear that, in the context of and as a response to Khan's emphatic badgering of Hayat, the statement also communicated Hayat's present intent not to attend a training camp.  The conversation at issue took place in early October

---

[4] The testimony was also arguably admissible under the rule of completeness.  *See* Fed. R. Evid. 106.

2003 while Hayat was in Pakistan.[5]  Khan testified that the previous July, Khan called Hayat and swore at him for "wasting time" taking care of his sick mother, instead of "going to a camp"; he challenged Hayat to "[b]e a man" and "do something."  In late August 2003, Khan called Hayat again, telling Hayat that he had complained to Hayat's father in California that Hayat was "just sitting there [in Pakistan], wasting his time."  Khan said Hayat's father told him Hayat would go for training after Ramadan.[6]  Khan congratulated Hayat and told him that he was "very happy" Hayat would be going to a camp.  In this context, Hayat's statement in early October that he never intended to go to a camp indicated his then-existing intent not to do so.

Hayat offers a useful example to illustrate this point:  If someone asked you when you were going to the movies today and you responded, "I never intended to go to the movies today," your response would obviously communicate your present intent not to go to the movies.  Moreover, under the *Hillmon* doctrine, the statement is admissible as tending to prove that you did not in fact go to the movies that day.  *See Wash. Water Power Co.*, 793 F.2d at 1082 n.4; Fed. R. Evid. 803(3) advisory committee note.    Likewise, Hayat's statement was admissible under Rule 803(3) to prove his then-existing intent not to go to a training camp, and also to prove that he did not in fact later attend such a camp.  The district court thus erred in preventing Khan from answering

---

[5] Khan testified that it was the last time they spoke to each other before Hayat returned to the United States in May 2005.

[6] In 2003, Ramadan fell between late October and early November.

the question whether Hayat said he never intended to go to a camp.[7]

## 2. *Impeachment*

Hayat's statement that he never intended to go to a camp and was lying to Khan all along was also admissible for the nonhearsay purpose of impeaching Khan because, regardless of the statement's truth, it contradicted Khan's testimony that he had no reason *not* to believe the stories Hayat told him. Fed. R. Evid. 607. The government asked Khan on direct examination whether he ever called Hayat a "liar." When Khan replied "yes," government counsel then asked, "When you called him a liar, did you always think he was actually lying?" Khan attempted to downplay the epithet, responding, "No. Sometimes it was just like when you are talking in English, and . . . someone is telling you a story, you tell them, Are you kidding? Like that."

In cross-examining Khan, Hayat's counsel tried to show that Hayat was a big talker or braggart who repeatedly lied and exaggerated about matters related to fundamentalism and terrorism. Khan insisted that he had no reason not to believe the various outlandish things (some demonstrably false) Hayat said – for example, that Hayat had spent time in

---

[7] The majority notes, somewhat puzzlingly, that Hayat failed to ask for a limiting instruction, which would have been necessary if the excluded testimony was admitted to show then-existing intent. Maj. Op. at 41–42. This is neither here nor there. It is undisputed that Hayat failed to advance an appropriate basis for admission of the excluded testimony – that is why it is being reviewed for plain error and not abuse of discretion. It is unclear why the majority thinks Hayat's counsel should (or even could) have sought a limiting instruction related to a ground for admission that she ignorantly or inadvertently failed to advance.

Pakistani jail for selling counterfeit money, but had been released through his grandfather's influence; that Hayat's uncle was the leader of the JUI party in Pakistan; that the Taliban sent messages through a Pakistani newspaper; and that the leader of the opposition in the National Assembly of Pakistan was tied to training camps.  When Hayat's counsel pointed out that Khan had called Hayat a liar, Khan said he was "joking" and that Hayat only lied about the "small stuff," for example, whether one could buy a cell-phone charger at a 99-Cent Store.

Hayat's statement that he never intended to go to a camp and was lying all along was thus relevant and admissible to impeach Khan.  *See United States v. Arteaga*, 117 F.3d 388, 397 n.18 (9th Cir. 1997) ("If a witness says 'X' on the stand, his out of court statement 'not-X' impeaches him, whether X is true or not.").  Regardless of whether the statement was true, it indicated that Khan *did* have a reason not to believe Hayat's boasts about his connections to fundamentalist leaders and terrorist training camps, which was certainly not "small stuff."  Whether Hayat had been lying all along or lying when he made the excluded statement, his inconsistency on a critical point gave Khan a reason not to believe him when he spoke of his involvement with and reverence for individuals seeking to conduct jihad against non-Muslims.

Because the excluded testimony was admissible on two, independent bases, the first element of the plain error analysis, the existence of error, is met.

**B.  "Plain" Error**

The second element requires the court to find that the error was plain under existing law, rather than subject to

reasonable dispute.  Plain error is error "that an experienced district judge can[ ] be expected to detect . . . on his own," even "without benefit of objection." *United States v. Turman*, 122 F.3d 1167, 1170 (9th Cir. 1997).  Thus, the error is plain if the district court, even without the benefit of hearing an applicable basis for admission from Hayat's counsel, should have admitted the testimony.

The first basis for admission argued on appeal, Hayat's then-existing state of mind, is a long-standing exception to the hearsay rule of which the district court was undoubtedly aware.  Fed. R. Evid. 803(3); *see, e.g.*, *United States v. Armijo*, 5 F.3d 1229, 1232 (9th Cir. 1993) (finding plain error where trial court admitted witness' prior inconsistent statement without a limiting instruction that the statement could be used to impeach the witness' credibility, but not as evidence of the defendant's guilt); *United States v. Sauza-Martinez*, 217 F.3d 754, 760 (9th Cir. 2000) (reversing for plain error where the district court failed *sua sponte* to provide a limiting instruction that certain evidence was admissible only as to co-defendant).  Here, the jury was asked to determine whether Hayat had attended a training camp. Aside from a government witness' testimony that there "possibly" or "probably" was a training camp in a region mentioned by Hayat in his bumbling confession, the main evidence of whether Hayat actually went to such a camp were his statements to Khan regarding his intent to go to such a camp.  If Hayat's statements to Khan on this issue were, as Hayat argues, equivocal, changing, and contradictory, the probative value of any one out-of-court statement of intent, out of context from the others, is dubious.  Fed. R. Evid. 401. Accordingly, the excluded testimony's probative value in establishing Hayat's intent – or lack of intent – should have been plain to the district court.

Furthermore, it is difficult to believe that even without a proper objection, the district court failed to recognize the patent unfairness in allowing Khan to provide testimony that bolstered Hayat's inculpatory out-of-court statements (such as Khan's testimony that he had no reason to disbelieve Hayat and, despite calling Hayat a liar, he never believed Hayat actually lied to him), while preventing the defense from eliciting testimony that would have undercut the strength of these out-of-court statements, undermined Khan's credibility, and supported the defense theory that Hayat was a storyteller and a braggart, who – despite making outlandish claims to Khan – had no involvement with extremist Islam or terrorism. *See United States v. Benveniste*, 564 F.2d 335, 342 (9th Cir. 1977) (holding that "the rejection of the exculpatory hearsay [testimony of a government witness] was in error, particularly in view that accusatory hearsay was admitted"). As the Second Circuit has noted, "[w]hen a trial judge observes occurrences that potentially call into question the fairness of the proceedings or the thoroughness of a defense, it is incumbent on the judge to inquire." *United States v. Awadallah*, 436 F.3d 125, 136 (2d Cir. 2006). Notwithstanding that the district court here did not have the benefit of hearing this basis for admission from Hayat's counsel, the error in not admitting the excluded statements for impeachment purposes is clear on the record.

## C. Substantial Rights

The third element in the plain error analysis is the error's effect on substantial rights. The appellant must show that there is "a reasonable probability that the error affected the

outcome of trial." *United States v. Marcus*, 130 S. Ct. 2159, 2164 (2010) (citing *Olano*, 507 U.S. at 734–35).[8]

"[W]here, as here, the Government's case may stand or fall on the jury's belief or disbelief of one witness, his credibility is subject to close scrutiny." *Gordon v. United States*, 344 U.S. 414 (1953). The principle "that appellate courts give the trial judge wide latitude in control of cross-examination . . . cannot be expanded to justify a curtailment which keeps from the jury relevant and important facts bearing on the trustworthiness of crucial testimony." *Id.* at 423. In *Gordon*, the defendants were convicted of theft largely based on the testimony of a co-defendant, Marshall. *Id.* at 415. As Marshall was the prosecution's key witness, defense counsel attempted to introduce evidence to impeach him. *Id.* Specifically, the defense sought to introduce: (1) contradictory statements made by the witness to the government; and (2) a transcript showing that the a judge may have influenced his testimony by stating, "I am not holding out any promises to you, but I think you would be well advised to tell the probation authorities the whole story even though it might involve others." *Id.* at 416–17. Up to that point, Marshall had not mentioned any "others" in four separate interviews; soon after the hearing, he did. *Id.* at 422. The trial court refused to admit this evidence on cross-examination. *Id.* at 417. Concluding that "we cannot say that these errors were unlikely to have influenced the jury's verdict," the Court found that they prejudiced substantial rights and reversed. *Id.*

---

[8] Because the majority concludes (wrongly, in my view) that there was no plain error, it does not address this factor.

In this case, as in *Gordon*, the prosecution centered on the testimony of a star witness, whose credibility therefore was "subject to close scrutiny." By excluding the testimony, the district court deprived the defense of an important and potentially effective means of impeaching Khan. The excluded evidence went to the heart of Khan's testimony. First, the exclusion prevented the defense from impeaching Khan's re-direct testimony that he had "no reason not to believe" Hayat intended to go to a training camp. This would have revealed that Khan – contrary to his emphatic testimony – indeed *did* have reason to doubt Hayat's intent to go to a camp because Hayat said as much to Khan. Second, the excluded evidence would have supported the defense theory that Khan and the government were selectively introducing inculpatory statements of intent while omitting exculpatory statements of intent. Had the jury been permitted to hear the excluded testimony, it "might reasonably have questioned [Khan's] reliability or credibility," *Holley v. Yarborough*, 568 F.3d 1091, 1099 (9th Cir. 2009) (internal quotation marks omitted), and might have discounted Khan's colorful characterizations of Hayat as a would-be jihadist based on Khan's own perceptions of Hayat's state of mind. This justifies the conclusion that there is a reasonable probability that the exclusion of this evidence affected the outcome of the trial.

The exclusion was a critical blow to the defense because the evidence was not – and could not have been – introduced by any other means. The excluded testimony was the sole means of impeaching the substance of Khan's testimony (as opposed to generally impeaching Khan's credibility by showing he was a paid informant of the FBI). Without this testimony, the defense was unable to counter Khan's insistence that Hayat expressed the intent to attend a terrorist

training camp. Accordingly, I would find that the error in excluding this testimony affected Hayat's substantial rights.

## D.  Serious Effect on the Fairness of the Proceedings

The fourth element, whether the error seriously affects the fairness, integrity or public reputation of judicial proceedings, "is meant to be applied on a case-specific and fact-intensive basis." *Puckett*, 129 S. Ct. at 1433. Generally, courts have relied on the presence of "overwhelming and uncontroverted evidence" of guilt as a basis for finding that a plain error did not seriously affect the fairness, integrity or public reputation of judicial proceedings. *E.g.*, *United States v. Cotton*, 535 U.S. 625, 634 (2007); *see Sauza-Martinez*, 217 F.3d at 760–61 (finding that plain error affected the defendant's substantial rights where the evidence against him "was by no means overwhelming"). Here, there is no such overwhelming evidence of guilt.

Given that the government introduced extensive inculpatory out-of-court statements and emphasized their reliability, the district court's exclusion of a crucial exculpatory statement made under identical conditions and contemporaneously with the inculpatory statement was grossly unfair. *See Benveniste*, 564 F.2d at 342. Hayat had a strong interest in ensuring that the jury knew the full story of his relationship with Khan, so that the jury could evaluate the reliability and completeness of Khan's testimony and properly judge Hayat's intent. The selective admission of Khan's conversations with Hayat unfairly presented a one-sided view of the evidence of Hayat's intent. This seriously calls into question the fairness and integrity of the proceedings.

Furthermore, there is no doubt that the "public reputation" of judicial proceedings has been seriously affected by the errors in Hayat's trial. The trial has been the subject of numerous critical news reports, magazine articles, and television programs questioning not only the government's investigation and prosecution, but also the soundness of the judicial branch's handling of the case. *See, e.g.*, *Frontline: The Enemy Within* (PBS television broadcasts 2006) (criticizing the investigation, prosecution and trial of Hamid Hayat); Mark Arax, "The Agent Who Might Have Saved Hamid Hayat," *L.A. Times Magazine* 16 (May 28, 2006) (criticizing the government's investigation and the trial of Hamid Hayat); Amy Waldman, "Prophetic Justice," *The Atlantic Monthly* 82 (Oct. 2006) (explaining possible jury bias); Chesney, *supra*, 80 S. Cal. L. Rev. at 491. The fourth requirement of the plain error analysis, therefore, is satisfied.

All four elements of the plain error doctrine having been satisfied, I would exercise our discretion and reverse and remand for a new trial.

### III

The government's expert witness, Khaleel Mohammed, teaches Islamic studies and is an erstwhile imam. He has experience in translating and interpreting prayers from a "faith based perspective, as well as from an academic perspective." Mohammed testified on direct examination that he translated from Arabic a written supplication found in Hayat's wallet. He translated it as: "Oh Allah we place you

at their throats and we seek refuge in you from their evils."[9] He then testified that the supplication was "not peaceful" because he looked up the supplication in several commentaries, and "just about every commentary [the expert] checked puts it [the supplication] in a case where someone who is in jihad makes this supplication, someone who is at war with a perceived enemy . . . ."  The following exchange then occurred between the prosecutor and the government's expert:

> Q. Based on your research and experience, what is the context, then, of this supplication?
>
> A. The context of the supplication is for when one is engaged in war, a holy war, fighting for God, against an enemy that is perceived to be evil.
>
> Q. In your opinion, would a particular kind of person carry this supplication?
>
> A. Yes.  A particular kind of person would carry this supplication.
>
> Q. What kind of person?

---

[9] This supplication also bears a striking similarity to the well-known Old Testament story in which David, after being rescued from Saul and his enemies, recites to God:  "Thou hast also given me the necks of mine enemies, that I might destroy them that hate me."  2 *Samuel* 22:41.

A. A person who perceives him or herself as being engaged in war for God against an enemy.[10]

Mohammed further testified that a person carrying this supplication would be "[a] person engaged in jihad." He insisted that *"there is no other way that it could be used."* He elaborated that it would be fair to say that this person would be a "jihadist" or "part of the mujahedeen." Among other sweeping conclusions, Mohammed explained that carrying this particular supplication means a person: "*has* to be involved in jihad"; *must* "perceive[ ] himself to be carrying out one of the obligations of jihad, that he was involved in what he deemed to be jihad'; and "was completely ready. The person was in the act of being a warrior."[11]

Notwithstanding Mohammed's blanket conclusions regarding Hayat's readiness to "engage in war," Hayat's counsel failed to object. As a consequence, the court may review only for plain error. Even under this more stringent standard of review, however, I would conclude that the district court plainly erred in allowing Mohammed to testify broadly about Hayat's supposed "jihadi intent," which usurped the jury's role as ultimate finder of fact.

---

[10] Mohammed later elaborated that the "enemy" referred to in the supplication could only be "an enemy of God."

[11] Inexplicably, irrelevantly, and prejudicially, the government questioned Mohammed about "warriors in Africa" who might carry amulets as protection. Mohammed then testified about "warriors in Eritrea, warriors in Southern Sahara," and the Egyptian Muslim Brotherhood.

The majority concludes that this testimony is not an improper opinion on Hayat's mental state constituting an element of the crime charged. Maj. Op. at 54. I strongly disagree. Fed. R. Evid. 704(b) provides that "[n]o expert witness testifying with respect to the mental state or condition of a defendant in a criminal case may state an opinion or inference as to whether the defendant did or did not have the mental state or condition constituting an element of the crime charged or of a defense thereto." These are "ultimate issues" to be decided by "the trier of fact alone." *Id.* From the record, it is clear that Mohammed stated an opinion as to Hayat's mental state. The linguistic nicety of referring to "a person who would carry this supplication in his wallet" rather than "Hayat" cannot save Mohammed's testimony. Moreover, Mohammed flatly and categorically testified that a person carrying this supplication "has to be involved in Jihad." It is plain on the record that "a person" could have been no one but Hayat.[12] The violation of rule 704(b) is plain and obvious. *See Puckett*, 129 S. Ct. at 1429.

The majority nonetheless relies on *United States v. Younger*, 398 F.3d 1179 (9th Cir. 2005), *abrogated on other grounds as stated in United States v. Vongxay*, 594 F.3d 1111, 1116 (9th Cir. 2010), a case about expert testimony relating to the drug trade, and similar cases, to conclude that Mohammed's testimony was not improper. Maj. Op. at 52–53. The majority's conclusion, however, stretches the *Younger* line of cases beyond the breaking point and beyond the limits of its logic. In *Younger*, a police lieutenant testified

---

[12] Mohammed opined on the kind of "person" who would carry this supplication only after testifying that the particular supplication at issue was "rare." This left little room for the jury to conclude that Hayat was "atypical."

"as an expert in the methodology of possession, use, manufacture, and distribution of illicit narcotic substances." *Id.* at 1188.  The lieutenant testified that "[t]he person" who possessed the quantity of drugs at issue in the case possessed it for the purpose of selling it.  *Id.* at 1189.  In evaluating the propriety of this expert testimony, the court explained that Rule 704(b)

> does not bar testimony supporting an inference or conclusion that a defendant does or does not have the requisite mental state, "so long as the expert does not draw the ultimate inference or conclusion for the jury and the ultimate inference or conclusion does not necessarily follow from the testimony."

398 F.3d at 1189 (quoting *United States v. Morales*, 108 F.3d 1031, 1038 (9th Cir. 1997)).  Deciding to admit the testimony at issue, the court noted that "[a]lthough the prosecutor's questions brought the testimony close to Rule 704(b)'s line of prohibition . . . the jury could have accepted his testimony and still infer that defendant was atypical."  *Id.*  But here, Mohammed's flat out, categorical statement crossed the *Younger* line because it left no room for the jury to infer anything other than that Hayat "has to be involved in jihad."

*Younger* relied on several earlier cases regarding expert testimony about the "methodology" of the narcotics trade.  In *United States v. Gonzales*, for example, a federal agent testified that "an individual" possessing the amount of drugs at issue in the case possessed them for sale and not personal use.  307 F.3d 906, 911 (9th Cir. 2002).  The agent testified that combined with possession of a handgun and scales, his opinion that the quantity of drugs at issue indicated an intent

to distribute "extremely firm." *Id.* The court concluded that this testimony did not run afoul of Rule 704(b) because even if the jury credited the agent's testimony, it "could have concluded that Gonzales was not a typical or representative person, who possessed the drugs and drug paraphernalia involved." *Id.* Together, *Younger* and its forebears establish a general rule that

> [g]overnment experts may "testify as to the general practices of criminals to establish the defendants' modus operandi" which "helps the jury to understand complex criminal activities, and alerts it to the possibility that combinations of seemingly innocuous events may indicate criminal behavior." *United States v. Valencia Amezcua*, 278 F.3d 901, 908–09 (9th Cir. 2002) (quoting *United States v. Johnson*, 735 F.2d 1200, 1202 (9th Cir. 1984)). We have allowed modus operandi testimony that "drug traffickers often employ counter-surveillance driving techniques, register cars in others' names, make narcotics and cash deliveries in public parking lots, and frequently use pagers and public telephones." *Id.* at 909 n.4.

*United States v. Freeman*, 498 F.3d 893, 906 (9th Cir. 2007); *see also United States v. Anchrum*, 590 F.3d 795, 804 (9th Cir. 2009) (finding government agent's testimony about why a hypothetical drug dealer would possess a firearm to be permissible expert testimony on the modus operandi of drug dealers).

The majority likens Mohammed's testimony about the state of mind of a person who would carry a written prayer in his wallet to that of law enforcement officers who testify about the modus operandi of "a person" who carries a large quantity of drugs, a firearm, and scales. Maj. Op. at 53–54. The factual scenarios are dissonant. In the *Younger* line of cases, the government experts at issue are law enforcement officers experienced in investigating the drug trade and related crimes. These officers testified about the signature accouterments of the drug trade and the modus operandi of drug dealers. Here, Mohammed, although professing some knowledge that jihadists may carry supplications, did not testify as an expert on the modus operandi of Islamic terrorists. Notwithstanding his lack of expertise in that field, he opined on what was in the heart and mind of a person who would carry a written prayer in his wallet.

As the Fifth Circuit recently noted,

> there is a fine but critical line between expert testimony concerning methods of operation unique to the drug business, and testimony comparing defendant's conduct to the generic profile of a drug courier. The former may be permissible to help a jury understand the significance and implications of other evidence presented at trial. The latter may impermissibly suggest that an innocent civilian had knowledge of drug activity. . . The inquiry does not turn on magic words, and the purpose of the inquiry must be to determine whether expert testimony is the "functional equivalent" of an opinion that the defendant knew he was carrying drugs.

*United States v. Gonzalez-Rodriguez*, 621 F.3d 354, 364 (5th Cir. 2010) (citations omitted).    Mohammed's opinion testimony stepped over this "fine but critical line."  Rather than testifying about the modus operandi of would-be terrorists,[13] Mohammed repeatedly stated that "a person" who would carry the supplication at issue was ready to engage in war, perceived himself as "a warrior," and was certainly a "jihadist" or part of the mujahadeen.  In short, Mohammed's testimony is the "functional equivalent" of an opinion that Hayat had the requisite intent to provide material support for terrorism – because he could not be anything other than a "jihadist."  Once an expert labels someone a "jihadist," what is left for the jury to determine?  The jury could not but reach the conclusion that a "jihadist" is guilty of "providing material support for terrorism."  There was no wiggle room for the jury to determine that Hayat was "atypical" and thus reach another conclusion.  *Younger*, 398 F.3d at 1189.

Furthermore, and perhaps more importantly, carrying a prayer in one's wallet is fundamentally unlike carrying the signature tools of the drug trade.  It is one thing to say that possessing drugs and scales indicates intent to sell drugs; it is quite another to say that carrying a religious invocation in one's wallet demonstrates intent imminently to engage in acts of war.   One is a conclusion drawn from the physical presence of tools, and employment of methods, commonly used in the drug trade.  The other is a written prayer, whose meaning to any particular faithful likely is obscure.  This is particularly so in this case because Hayat did not speak or read Arabic, the language in which the prayer was written.

---

[13] The record does not indicate that Mohammed's expertise as an Islamic scholar and in Arabic made him an expert on the modus operandi of Islamic terrorists, let alone on Pakistani terrorists.

An analogy may be helpful. Suppose a Christian is arrested on suspicion of providing material support for terrorism. In the suspect's wallet is found the following excerpt: "Onward, Christian soldiers, marching as to war/ With the cross of Jesus going on before/ At the sign of triumph Satan's host doth flee/ On then, Christian soldiers, on to victory!" An academic, an expert on the Bible and its translation, is called to testify at the suspect's trial. Asked what kind of person would carry this hymn, the academic testifies, "A person who believes him or herself as being engaged in a war for [Jesus] against an enemy."

Such testimony would be laughable. We easily comprehend, without the aid of expert testimony, that "'Onward, Christian Soldiers' does not mean that the zealous churchman is literally militant." *Berg v. State*, 233 P. 497, 503 (Okla. Crim. App. 1925). Someone carrying it might be a non-violent volunteer for the Salvation Army, or a Methodist, or a supporter of the phrase "under God" in the Pledge of Allegiance. *See Newdow v. Rio Linda Union Sch. Dist.*, 597 F.3d 1007, 1056–57 (Reinhardt, J., dissenting) (describing the celebratory playing of "Onward, Christian Soldiers" after Congress amended the Pledge of Allegiance to add the phrase "under God"). Alternatively, the person could be a member of the Ku Klux Klan. *See Virginia v. Black*, 538 U.S. 343, 356 (2004) (describing the singing of "Onward, Christian Soldiers" at cross burnings). It is inconceivable that a court would allow an "expert" to opine definitively and categorically on the "kind of person" who would carry "Onward, Christian Soldiers" in his wallet because the conceivable variations in understanding and

motivation are too great.[14]    Yet this is exactly what the government expert in this case was permitted to do with respect to the prayer found in Hayat's wallet.

In the hypothetical, it is clear that the expert's testimony is both over-the-top and invades the province of the jury. There is an absence of clarity in this case simply because the testimony was given in relation to Islam, a religion whose tenets are unfamiliar to the vast majority of Americans.[15]    The jurors in Hayat's trial, therefore, were particularly susceptible to deferring to Mohammed's "expert" testimony not only as to the translation and meaning of the supplication, but also as to the ultimate question of whether the supplication proved

---

[14] One can imagine what would happen if the hypothetical suspect were apprehended in another country, one without our familiarity with Christianity.   "In an Oriental missionary field, 'Onward, Christian Soldiers' is said to be regarded as an alien, seditious war song, the use of which the missionaries had to abandon." *Colyer v. Skeffington*, 265 F. 17, 59 (D. Mass. 1920) (granting writs of habeas corpus to petitioners detained pending deportation because the Commissioner of Immigration failed to establish that petitioners' membership in the Communist Party meant they advocated the violent overthrow of the United States government), *reversed sub nom. Skeffington v. Katzeff*, 277 F. 129 (1st Cir. 1922).

[15] A Pew Research Center poll found that in 2005 (at the time of Hayat's trial), 66 percent of Americans knew "not very much" or "nothing at all" about the Muslim religion.  *Public Remains Conflicted Over Islam*, http://pewforum.org/Muslim/Public-Remains-Conflicted-Over-Islam.aspx (Aug 24, 2010).   Given this, it is probable that most Americans – and many of the jurors in this case – are unaware of diversity of belief and culture among Muslims.   "Like other religions, Islam also has different–and sometimes contending–theologies, law schools, and Sufi (mystic) orders."  John L. Esposito & Dalia Mogahed, *Who Speaks for Islam?: What a Billion Muslims Really Think* 3 (2007).

that Hayat was a "jihadist" (*i.e.*, a terrorist) – the kind of person who would carry such a prayer.

Accordingly, it was patently improper to allow Mohammed to testify beyond the translation of the supplication from Arabic into English and the meaning of the supplication, if he knew.  His testimony went beyond translation and interpretation – Mohammed testified specifically about the "kind of person" who would carry the supplication.  He testified about such a "person's" intent.  This is crucial here.  The government's theory was that Hayat went to a terrorist training camp and returned to the United States intent in engaging in some undefined future act of terrorism.  Hayat's intent to support terrorism is an "ultimate inference or conclusion" that the jury should have decided for itself.  *See United States v. Morales*, 108 F.3d 1031, 1037 (9th Cir. 1997) ("A prohibited 'opinion or inference' under Rule 704(b) is testimony *from which it necessarily follows*, if the testimony is credited, that the defendant did or did not possess the requisite mens rea." (emphasis added)).

Given the translation alone, or even the translation plus Mohammed's testimony that the supplication was cited in scholarly commentaries in the context of warfare, the jury had enough information to conclude for itself whether the presence of the supplication in Hayat's wallet supported an inference that he had the requisite intent to provide material support for terrorism.  That is all the jury should have heard.  The additional testimony about the "kind of person" who would carry such a supplication and such a person's intent was not only inflammatory, it invaded the province of the jury.  The jury's authority, plainly, was ceded to the expert.

## IV

Because the district court plainly erred in preventing Hayat from introducing exculpatory evidence and in allowing inflammatory expert testimony that usurped the jury's role as finder of fact, I would reverse Hayat's conviction and remand to the district court for a new trial. I therefore respectfully dissent.[16]

---

[16] Because I would reverse the conviction for each of the two errors discussed in this opinion, I do not reach Hayat's third major contention – that Juror Joseph Cote was biased – which the majority also rejects. *See* Maj. Op. at 16–29.